OFFICE OF CONSUMER ADVOCATE,
A Division of the Iowa Department of
Justice, Appellant,

v.

IOWA UTILITIES BOARD, Appellee,

and

Qwest Corporation, Intervenor–
Appellee.

No. 02–0720.

Supreme Court of Iowa.

June 11, 2003.

Donald G. Henry and John R. Perkins, Des Moines, for appellant.

Cecil I. Wright and Allan Kniep, Des Moines, for appellee.

David A. Sather, Des Moines, and Joseph V. Hatala, Des Moines, for intervenor-appellee.

LARSON, Justice.

The Office of Consumer Advocate (OCA) [1] appealed a district court ruling approving an Iowa Utilities Board deter-

1. The OCA is a division of the attorney general's office charged with the investigation "of all persons under the jurisdiction of the utilities board" and empowered to file civil pro-ceedings to correct any illegality on the part of such persons. Iowa Code § 475A.2(1) (1999).

mination that a rate reduction plan presented by Qwest Corporation (formerly US WEST) for selected telecommunications services should be approved. We affirm.

## I. *Facts and Prior Proceedings.*

A three-year price regulation plan was submitted pursuant to Iowa Code section 476.97(1) (1997) by Qwest on July 1, 1998, and approved by the board. The price plan included provisions for rate increases and, as relevant in this case, provisions for rate decreases as well:

> E. Price Decreases. [Qwest] can decrease any BCS [basic communications service] price to any lawful price, upon a showing that the requirements of IAC 38.5(4) are met. Any such decrease may be accumulated and used to offset a decrease or portion thereof required during the following 12 months.

> [Qwest] shall decrease its BCS price in a percentage amount equal to the amount that the Productivity offset exceeds the annual rate of inflation ... on an anniversary date of the effective date of this Plan. If the required decrease is less than 2%, the reduction may be deferred for one year. Any required price decrease can be offset by a price increase which would have been permitted during the preceding twelve months.

The annual rate of inflation, according to the plan is

> the annual percentage change (the value of the index in the most recent quarter divided by the value of the index for that quarter in the previous year minus one) in the Gross Domestic Product Price Index (GDPPI) constructed using chain-type annual weights as published in the most recently available monthly edition of the U.S. Department of Commerce's Survey of Current Business, Table 7.1.

Under the Qwest plan, Qwest was required to adjust its prices on November 7, 1999, the beginning of the second year of the plan, if the productivity offset exceeded the inflation rate by two percent or more. On October 8, 1999, a month before the end of the first year, Qwest submitted a letter indicating that a 1.41% decrease was required by the plan and notifying the board of its decision to defer the decrease for one year, as allowed by the plan. Qwest used the GDPPI calculations from the September 1999 advance GDPPI to calculate the decrease. On November 8, 1999, Qwest filed an amended calculation using the October 1999 advance GDPPI, which resulted in a reduction of 1.21%. In October 2000 Qwest submitted a proposal to adjust basic service prices using the GDPPI data available on the Bureau of Economic Analysis's (BEA) *website* in order to make its calculations under Iowa Code section 476.97(3)(a)(5), and (6) (1999). Iowa Code section 476.97(3)(a)(5) provides:

> The plan shall provide for both increases and decreases in the prices for basic communications services reflecting annual changes in inflation and productivity. Prior to January 1, 2000, the board shall use the gross domestic product price index, as published by the federal government, for an inflation measure, and two and six-tenths percentage points for a productivity measure. On or after January 1, 2000, the board by rule may adopt current measures of inflation and productivity.

Iowa Code section 476.97(3)(a)(6) provides rules for deferral and accumulations of price increases. It then provides:

> A price decrease for basic communications services shall not be deferred or accumulated, except that price decreases of less than two percent may be deferred by the local exchange carrier for one year. A price decrease required

under this section may be offset by a price increase for a basic communications service that would have been permitted under this section in the previous twelve-month period, but which was deferred by the local exchange carrier.

In October 2000 the OCA objected to Qwest's price-plan adjustment, contending the rate of inflation, when measured according to the price plan, was 1.19%, which would result in a difference between productivity and inflation of 1.41%. The OCA also contended the statute and price plan require that reductions must be implemented across the board and that Qwest's revenue-based method of reductions, to be applied to certain services, was unlawful.

The board ruled that the price plan allowed Qwest to make reductions to selected services, as it proposed, in order to implement the required decrease. The board also allowed Qwest to use the figures from the internet and not the figures provided by OCA, which were from the printed version of the same source. The board reasoned that the critical language in the price plan was that the figures used be the most current available and that the generally accepted definition of "published" was broad enough to include data publicly available regardless of its format—internet as well as printed form.

The OCA filed a petition for judicial review. The district court affirmed the board, concluding that the numbers from the BEA website provided the most accurate values and that the board's decision to allow Qwest to use them was within the statute and within the zone of reasonableness. The court also found that reductions in price selectively based on revenue, rather than across the board, were reasonable and within the board's discretion.

## II. *Standard of Review.*

The board construed the applicable statutes in a way that supports its conclusions, and the amount of deference we give to its interpretation is significant in our analysis of the case. Although courts give only limited deference to an agency interpretation of law, an "agency's determination of a question of law is given careful consideration in areas of the agency's expertise." *Madrid Home for the Aging v. Iowa Dep't of Human Servs.*, 557 N.W.2d 507, 510–11 (Iowa 1996). The OCA argues that revisions to the Iowa Administrative Procedure Act (IAPA) in 1998 effectively overruled the *Madrid Home* decision, but we disagree. The revisions were intended to confirm and clarify "that interpretation is normally a judicial function, except when the legislature has delegated the discretionary authority to the agency." *Locate.Plus.Com v. Iowa Dep't of Transp.*, 650 N.W.2d 609, 613 (Iowa 2002). One commentator has made the following observations with respect to the court's determination of whether such authority has been delegated:

> The reviewing court, using its own independent judgment and without any required deference to the agency's view, must have a firm conviction from reviewing the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved, that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretative power with the binding force of law over the elaboration of the provision in question.

Arthur Earl Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998) [hereinafter Bonfield].

The legislature carefully considered the role of the board in price regulation. In its policy statement, the legislature instructed the board to "address issues relating to the movement of prices toward cost and the removal of subsidies in the

existing price structure of the incumbent local exchange carrier." Iowa Code § 476.95(3) (1997). The legislature regarded the board's expertise as critical to effective management of this area; the board was to "respond with speed and flexibility to changes in the communications industry." (Iowa Code § 476.95(5)). We conclude the legislature gave the board discretion as contemplated by the IAPA. *See* Iowa Code § 17A.19(11)(c). Therefore, the board's interpretation of the applicable statutes is entitled to "appropriate deference." *Id.*

Telecommunications services are a public utility, and the court grants "considerable deference to the agency's expertise, especially when the decision involves the highly technical area of public utility regulation." *S.E. Iowa Coop. Elec. v. Iowa Utils. Bd.,* 633 N.W.2d 814, 818 (Iowa 2001). Given the legislature's obvious regard for the expertise of the public utilities board in the area of price regulation of telecommunications services, it is clear that this is precisely the type of expertise toward which the court should grant great deference. The district court, in scrutinizing the agency's decision to see if it fell within the "zone of reasonableness," applied the proper standard of review. *See id.,* 633 N.W.2d at 818; Bonfield at 63. We apply that standard of review in this appeal.

### III. Resolution.

■ A. *Which version is to be used?* The OCA argues that some of the language in the Qwest price plan to the "Survey of Current Business," requiring "the most recently available monthly edition," means Qwest must use the printed version of the Survey. However, we believe this gives the word "publication" too narrow a meaning. The BEA, in describing the availability of its tables, makes no distinction as to the medium in which it is to be published. A notice on the availability of the new tables states: "The redesigned NIPA tables will be available in hard copy, on diskette, and on BEA's Web site at www.bea.doc.gov on October 1." Brent R. Moulton & David F. Sullivan, *A Preview of the 1999 Comprehensive Revision of the National Income and Product Accounts,* Survey of Current Business (September 1999) (*available at* www.bea.gov). In its mission statement, the BEA says that it "promotes a better understanding of the U.S. economy and its competitive position by providing the most accurate and relevant gross domestic product (GDP) and economic accounts data in a timely and cost effective manner." (http://www.bea/role.html (last visited May 28, 2003)) In view of the BEA's interest in timely and accurate information, it is unlikely it would advocate the use of outdated information in calculations. This is the essence of the board's ruling, affirmed by the district court, and we believe it was correct.

■ B. *Application of cost reductions.* Qwest reduced prices for selected communications services to effect the required 1.21% overall reduction, rather than reducing prices across the board to all Qwest services as argued by the OCA. The board approved this method, finding nothing in the Qwest plan or the applicable statutes that required the reductions to be made across the board. This was consistent with earlier board rulings and reflects a concern for costs in various Qwest services. To reduce prices across the board, rather than with regard to productivity, would mean in certain areas Qwest's prices charged would be below its costs.

We believe the board acted within its authority on these issues, and we therefore affirm.

**AFFIRMED.**