# IN THE SUPREME COURT OF IOWA

No. 143 / 06-0541

Filed February 15, 2008

**OFFICE OF CONSUMER ADVOCATE,**

Appellant,

vs.

**IOWA UTILITIES BOARD,**

Appellant.

------------------------------------------------------

**MCI WORLDCOM, INC.,**

Appellee,

vs.

**IOWA UTILITIES BOARD,**

Appellant.

---

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal, Judge.

The Office of Consumer Advocate and the Iowa Utilities Board appeal an adverse judicial review decision. **AFFIRMED.**

John R. Perkins, Consumer Advocate, and Craig F. Graziano, Des Moines, for appellant Office of Consumer Advocate.

David Lynch, General Counsel, and Mary F. Whitman, Assistant General Counsel, Des Moines, for appellant Iowa Utilities Board.

Krista K. Tanner and Bret A. Dublinske of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, for appellee.

**WIGGINS, Justice**.

The Iowa Utilities Board (Board) interpreted Iowa Code section 476.103 (2003) and Iowa Administrative Code rule 199—22.23 (1999) to require the verification of a change in telecommunications service and a verification of the terms and conditions the customer consented to when agreeing to the change. On judicial review, the district court reversed the decision of the Board finding these provisions only required the carrier to obtain the customer's verification of a change in service, not a verification of the terms and conditions of the change in service. Because we agree with the district court's interpretation of section 476.103 and rule 199—22.23, and because we find the Board's interpretation of rule 199—22.23 irrational, illogical, or wholly unjustifiable under Iowa Code section 17A.19(10)(*l*), we affirm the decision of the district court.

## I. Background Facts and Proceedings.

On November 16, 2002, a telemarketer contacted Dr. Syam Kilaru on behalf of MCI Worldcom. According to Kilaru, the telemarketer told him if he changed his telephone service to MCI he would receive an international long distance rate of 37 cents per minute for calls to India on any day of the week, at any time. The telemarketer also informed Kilaru he would receive one hour of free calling to India per month for the first three months of MCI's service and 200 minutes of domestic long distance minutes for a monthly fee of $12.95.

Kilaru agreed to switch his telephone service to MCI. The telemarketer transferred Kilaru's call to a third-party verification company hired by MCI. Kilaru verified that he agreed to transfer his phone service to MCI. The verification call was recorded but the original call describing the rates was not.

Five or six business days later, MCI sent Kilaru a welcome packet explaining his rates. Kilaru did not review it. The welcome packet stated the rate for calls to India was 49 cents per minute on weekdays and 42 cents per minute on weekends. The welcome packet made no mention of the free calls to India. Kilaru first discovered he was being charged more than what the telemarketer represented when he received his first bill.

On January 8, 2003, Kilaru filed an informal complaint with the Board alleging MCI did not honor the rate it offered him to switch long distance carriers. Kilaru alleged he switched long distance carriers from AT&T Communications of the Midwest to MCI in response to MCI's offer. Pursuant to its rules, the Board forwarded Kilaru's complaint to MCI on January 10.

MCI responded, stating its records indicated Kilaru was to be billed 49 cents per minute for weekday calls to India and 42 cents per minute on the weekends, and the sign-up bonus was a free month of domestic long distance calling, not free international long distance. MCI's response pointed Kilaru to the welcome packet, which indicated the 42 and 49 cent per minute rates. In its response MCI agreed to credit Kilaru $219.27 for the first month of calls to India that were not billed in accordance with the 37 cent per minute rate. Future calls would be billed at the higher rates.

On March 10 the Board issued a proposed resolution and concluded MCI complied with the Board's and the federal communication commission's rules by using a third-party verification company. Therefore, the Board found MCI obtained the required authorization to switch Kilaru's service and billed him the correct rate. The Board informed Kilaru that he could request a formal proceeding if he did not agree with the proposed resolution.

On March 24 the Office of Consumer Advocate (OCA) filed a petition with the Board contesting the March 10 proposed resolution. The OCA requested the Board impose civil penalties against MCI for committing an unlawful slam in violation of Iowa Code section 476.103.

On July 14, 2004, a hearing was held before an administrative law judge (ALJ), at which Kilaru and a representative from MCI testified. The ALJ found Kilaru's testimony credible and found MCI violated section 476.103 and rule 199—22.23.

As a remedy, the ALJ reasoned because there was no meeting of the minds, there was no valid contract, and MCI should zero out Kilaru's account. However, the ALJ found because there was no evidence MCI intended to mislead Kilaru, a penalty would have no deterrent effect and would therefore be inappropriate.

Both the OCA and MCI appealed the ALJ's decision to the Board. The Board affirmed the ALJ. The OCA petitioned for judicial review, challenging the Board's determination that civil penalties should not be awarded. MCI filed a cross-appeal/motion to intervene. The district court treated MCI's motion as a petition for judicial review.

The district court reversed the Board's decision and dismissed the OCA's petition. The Board and the OCA appeal the district court's decision.

**II. Issue.**

We must decide whether the verification provisions contained in the statute and rules only require the verification of a change in carriers or whether the statute and rules also require verification of the terms and conditions of service.

### III. Discussion.

Rules promulgated by an agency represent the agency's interpretation of the Iowa Code provisions the legislature gave it to administer. *Iowa Ag Const. Co. v. Iowa State Bd. of Tax Review*, 723 N.W.2d 167, 173 (Iowa 2006); *see also* Iowa Code § 17A.3(1)(*c*) (requiring an agency to adopt rules "embodying appropriate standards, principles, and procedural safeguards that the agency will apply to the law it administers"). The legislature requires us to "give appropriate deference to the view of the agency with respect to particular matters that have been vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(11)(*c*). When the legislature has clearly vested the interpretation of a law in the discretion of the agency, the court only reverses the agency if its ruling is "[b]ased upon an irrational, illogical, or wholly unjustifiable interpretation of a provision of law . . . ." *Id.* § 17A.19(10)(*l*). However, when the legislature has not clearly vested the interpretation of a law in the discretion of the agency, the court applies a clearly erroneous standard. *Id.* § 17A.19(10)(*c*).

The legislature's requirement that the Board "adopt rules prohibiting an unauthorized change in telecommunication service" evidences a clear legislative intent to vest in the Board the interpretation of the unauthorized-change-in-service provisions in section 476.103. *See, e.g., Thoms v. Iowa Pub. Employees' Ret. Sys.*, 715 N.W.2d 7, 11 (Iowa 2006) (holding section 97B.4, which provides IPERS with authority to make rules and take other action " 'necessary for the administration of the retirement system in conformity with the requirements of this chapter,' " vested the interpretation of the statute in the agency's discretion (quoting Iowa Code § 97B.4(2)(*a*) (1995)); *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004) (holding section

123.21, which grants the agency power to adopt rules "necessary to carry out this chapter," vested the interpretation of section 123.45 with the agency). Therefore, we will only reverse the Board's decision if it is based upon an irrational, illogical, or wholly unjustifiable interpretation of section 476.103.

Regardless of the standard of review the legislature requires courts to use when reviewing agency action, the interpretation and final construction of a statute, or an agency rule interpreting a statute, is an issue for the courts to decide. *Hollinrake v. Iowa Law Enforcement Acad.*, 452 N.W.2d 598, 601 (Iowa 1990). We have applied nearly identical rules for the construction of statutes to the construction of administrative rules. *Id.*

When a statute or rule is plain and its meaning is clear, the rules of statutory construction do not permit courts to search for meaning beyond its express terms. *State v. Snyder*, 634 N.W.2d 613, 615 (Iowa 2001). Courts generally presume words contained in a statute or rule are used in their ordinary and usual sense with the meaning commonly attributed to them. *Am. Home Prods. Corp. v. Iowa State Bd. of Tax Review*, 302 N.W.2d 140, 142–43 (Iowa 1981). Moreover, courts construe a term according to its accepted usage when a statute does not define it. *Id.* Courts only resort to rules of statutory construction when the explicit terms of a statute or rule are ambiguous. *City of Waukee v. City Dev. Bd.*, 590 N.W.2d 712, 717 (Iowa 1999). A statute or rule is ambiguous if reasonable minds could differ or be uncertain as to the meaning of the statute. *Carolan v. Hill*, 553 N.W.2d 882, 887 (Iowa 1996).

The legislature required the Board to "adopt rules prohibiting an unauthorized change in telecommunication service." Iowa Code

§ 476.103(3). The legislature required the rules to "be consistent with federal communications commission regulations regarding procedures for verification of customer authorization of a change in service." *Id.* The legislature defined a "change in service" as:

> the designation of a new provider of a telecommunications service to a consumer, including the initial selection of a service provider, and includes the addition or deletion of a telecommunications service for which a separate charge is made to a consumer account.

*Id.* § 476.103(2)(*a*). At a minimum, the legislature required the rules to provide:

> *a.* (1) A submitting service provider shall obtain verification of customer authorization of a change in service before submitting such change in service.
>
> (2) Verification appropriate under the circumstances for all other changes in service.
>
> (3) The verification may be in written, oral, or electronic form and may be performed by a qualified third party.
>
> (4) The reasonable time period during which the verification is to be retained, as determined by the board.
>
> *b.* A customer shall be notified of any change in service.
>
> *c.* Appropriate compensation for a customer affected by an unauthorized change in service.
>
> *d.* Board determination of potential liability, including assessment of damages, for unauthorized changes in service among the customer, previous service provider, executing service provider, and submitting service provider.
>
> *e.* A provision encouraging service providers to resolve customer complaints without involvement of the board.
>
> *f.* The prompt reversal of unauthorized changes in service.
>
> *g.* Procedures for a customer, service provider, or the consumer advocate to submit to the board complaints of unauthorized changes in service.

*Id.* § 476.103(3)(*a*)–(*g*).

In enacting section 476.103, the legislature required the Board to make rules prohibiting an unauthorized designation of a new telecommunications service provider to a consumer. The legislature required the rules to be consistent with the federal communications commission's regulations regarding the procedures for verification of customer authorization to change service. The legislature also required the rules to contain certain minimum requirements regarding verification, notification, compensation, and complaint resolution. The legislature did not define what constituted an unauthorized change in service, but left that decision up to the expertise of the agency.

In response to the legislature's mandate, the Board adopted rules prohibiting service providers from making an unauthorized change in telecommunications services. Iowa Admin. Code r. 199—22.23. The Board's rules defined three acts consistent with the legislature's definition of "change in service"—cramming, jamming, and slamming. *Id.* r. 199—22.23(1). The alleged violation in the present suit is that MCI engaged in slamming when it switched Kilaru's service to MCI.

The Board's rules define "slamming" as "the designation of a new provider of a telecommunications service to a customer, including the initial selection of a service provider, without the verified consent of the customer." *Id.* The Board defined "verified consent" as "verification of a customer's authorization for a change in service." *Id.*

Rule 199—22.23(2) contains the Board's rules regarding the prohibition of unauthorized changes in telecommunications service. *Id.* r. 199—22.23(2). Rule 199—22.23(2)(*a*) sets forth the verification required before a carrier can change a customer's service. It states:

> *Verification required.* No service provider shall submit a preferred carrier change order or other change in service

order to another service provider unless and until the change has first been confirmed in accordance with one of the following procedures . . . .

*Id.* r. 199—22.23(2)(*a*).

MCI used a qualified independent third party to verify Kilaru's authorization before it changed service. Rule 199—22.23(2)(*a*)(3) deals with the verification required from a third party as follows:

> An appropriately qualified independent third party has obtained the customer's oral authorization to submit the preferred carrier change order that confirms and includes appropriate verification data (e.g., the customer's date of birth or social security number). . . . The content of the verification must include clear and conspicuous confirmation that the customer has authorized a preferred carrier change . . . .

*Id.* r. 199—22.23(2)(*a*)(3). The first sentence of rule 199—22.23(2)(*a*)(3) incorporates the definition of verified consent by requiring the independent third party to obtain the customer's oral authorization to submit to the preferred carrier change. It defines the verification data needed from the customer to confirm the customer's authorization for a change in service. The verification only needs to confirm that the customer was the person who authorized the change. The independent third party verifies the identity of the customer by obtaining the birth date or social security number of the customer.

The last sentence of the rule requires the independent third party to verify that the customer authorized a preferred carrier change. The rule does not define "authorize." Black's Law Dictionary defines "authorize" as "to formally approve" or "to sanction." *Black's Law Dictionary* 129 (7th ed. 1999). The general dictionary definition is similar: "to endorse, empower, or permit by." *Merriam-Webster's Collegiate Dictionary* 164 (10th ed. 2002). Applying the common meaning given to the word "authorize," the customer is only required to approve,

sanction, endorse, empower, or permit a preferred carrier change. The rule does not require verification of the terms of the authorization. Accordingly, we find the rule as written by the Board is unambiguous. The rule does not require a verification of the terms and conditions that the customer consented to when agreeing to the change. Therefore, the Board's interpretation of the rule requiring such verification is irrational, illogical, or wholly unjustifiable.

We also note this holding is consistent with the other verification provisions in rule 199—22.23. A carrier may obtain a verification of a change in service by a written authorization from the customer, an electronic authorization from the customer, or a customer-originated change. Iowa Admin. Code r. 199—22.23(2)(*a*)(1), (2), (4). The rules governing each one of these methods of verification describe the information needed from the customer in order to change service. *Id.* In fact, the rule dealing with a written authorization is very specific as to what needs to be included in the verification. *Id.* r. 199—22.23(2)(*a*)(1). A written authorization requires clear and unambiguous language that confirms: (1) the customer's billing name, address, and telephone number; (2) the decision to change from one provider to another; (3) the designation of the new provider; (4) the customer understands that only one service provider may be designated for certain services; and (5) the customer may incur a charge for changing service providers. *Id.* r. 199—22.23(2)(*b*)(5).

None of the permissible verifications require the customer to verify the terms and conditions the customer consented to when agreeing to change service carriers. Had the Board wanted to require such a verification it could have done so by writing that requirement into its rules. After all, one of the purposes of rulemaking is to express the

policy of an agency in a rule in order to give any affected persons fair notice of the law before they engage in conduct, which may be governed by those rules. Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 16 (1998). Making policy by ad hoc decisions on a case-by-case basis is contrary to the legislative intent of Iowa Code section 17A.3(*c*). *Id.* 16–19.

## IV. Disposition.

Finding the Board's interpretation of rule 199—22.23 to be irrational, illogical, or wholly unjustifiable, we affirm the judgment of the district court reversing the Board's decision.

**AFFIRMED.**

All justices concur except Appel, J., who takes no part.