■ MANSFIELD, Justice
(concurring specially).
I concur in the result only. This proceeding involves an effort by MidAmerican Energy to have Iowa’s ratepayers shoulder the costs of a new wind energy project even though MidAmerican does not forecast a need for additional capacity until 2019. The majority comments at several points on' the desirability of the project. Generally speaking, I feel less qualified to reach these conclusions but more confident about the Iowa Utilities Board’s authority to approve the project.
I. Deference to the Iowa Utilities Board.
The first question before us is the deference we are required to give to the Board’s interpretations of section 476.53 of the Iowa Code. I believe the majority’s refusal to grant deference is flawed and contrary to precedent.
Historically, we have deferred to the Iowa Utilities Board’s interpretation of the complex and technical laws that it administers. In doing so, we have relied upon the legislature’s grants of rulemaking authority to the Board. See, e.g., Iowa Code §§ 476.2(1), 476.103(1) (2009). Thus, in City of Coralville v. Iowa Utilities Board, we said that the Board “has clearly been vested with authority to interpret the ‘rates and services’ provision of section 476. 1, and we may therefore overturn its interpretation only if it is ‘irrational, illogical, or wholly unjustifiable.’ ” 750 N.W.2d 523, 527 (Iowa 2008) (quoting Iowa Code § 17A.19(10)(()); see also Evercom Sys., Inc. v. Iowa Utils. Bd., 805 N.W.2d 758, 762-63 (Iowa 2011) (stating that the utility board’s interpretation of a provision in chapter 476 should only be reversed if it is “irrational, illogical, or wholly unjustifiable”); Office of Consumer Advocate v. *51 Iowa Utils. Bd., 744 N.W.2d 640, 643-44 (Iowa 2008) (same); AT&T Commc’ns of the Midwest, Inc. v. Iowa Utils. Bd., 687 N.W.2d 554, 561 (Iowa 2004) (same); Office of Consumer Advocate v. Iowa Utils. Bd, 663 N.W.2d 873, 876 (Iowa 2003) (stating “the board’s interpretation of the applicable statutes is entitled to ‘appropriate deference’ ” (citation omitted)).
True, we held in Renda v. Iowa Civil Rights Commission that a grant of rule-making authority generally does not give an agency interpretive authority over a term that “has an independent legal definition,” such as “employee.” 784 N.W.2d 8, 14 (Iowa 2010). But I do not believe we overturned our prior decisions requiring deference to IUB legal interpretations within the Board’s area of expertise. Certainly we did not say in Renda that we were overruling those cases. To the contrary, in Renda we cited City of Coralville with approval, acknowledging that the Board had been vested with authority to interpret “provisions relating to the regulation of public utility rates and services.” Id. (citing City of Coralville, 750 N.W.2d at 527).
Furthermore, less than a year ago, and after Renda, we decided Evercom Systems. There, the Board had instituted a civil penalty against Evercom Systems for “cramming,” a “violation based on improper billing for collect telephone calls.” Ev-ercom Sys., 805 N.W.2d at 760. We first had to determine the appropriate standard of review for the “Board’s interpretation of the term ‘unauthorized change in service’ under Iowa Code section 476.103, and the Board’s interpretation of the definition of ‘cramming’ as that term is defined in Iowa Administrative Code rule 199-22.23(1).” We explained:
Section 476.103(3) requires the Board to “adopt rules prohibiting an unauthorized change in telecommunication service.” While this command from the legislature is not an explicit grant of the authority to interpret the term “unauthorized change in telecommunications service,” see Renda, 784 N.W.2d at 13, we have held that the rule making requirement contained in section 476.103 “evidences a clear legislative intent to vest in the Board the interpretation of the unauthorized-change-in-service provisions in section 476.103.” Office of Consumer Advocate, 744 N.W.2d at 643. The term “unauthorized change in service” is a “substantive term within the special expertise of the agency” and, therefore, we will only reverse the agency’s interpretation of that term if it is irrational, illogical, or wholly unjustifiable. Renda, 784 N.W.2d at 14.
Id. at 762-63.
Unfortunately, my colleagues in the majority forsake precedent without discussing it. Instead, the majority relies on dictionary definitions of “govern” and “exercise” to conclude that section 476.2(1) does not grant any interpretive authority to the Board at all. I question the majority’s effort to “make a fortress out of the dictionary,” Cabell v. Markham, 148F.2d 737, 739 (2d Cir.1945) (Hand, J.), and believe there are multiple problems with the majority’s analysis.
For one thing, the majority does not read section 476.2(1) in its entirety. Just before the grant of rulemaking authority is a statement that “[t]he board shall have broad general powers to effect the purposes of this chapter.” Iowa Code § 476.2(1). If the Board has broad powers, it is logical to defer to the Board’s legal interpretations of technical terms, as we have done in the past. The majority also disregards our determination in City of Coralville that the Board had “clearly been vested with authority” to interpret a term in section 476.1 and therefore its *52 interpretation might only be overturned if “irrational, illogical, or wholly unjustifiable.” 750 N.W.2d at 527 (citing Iowa Code § 17A.19(10)(i)). Although we did not expressly state where that authority came from, it could only have come from section 476.2(1).
Furthermore, even the majority concedes that its dictionary definitions do not get it as far as it needs to go. Instead, after quoting Webster’s, the majority concludes that the sentence regarding rule-making in section 476.2(1) is merely “ambiguous” as to the extent of the Board’s authority, so it relies on the next sentence that makes the Board “subject to the provisions of chapter 17A.” See Iowa Code § 476.2(1). How this justifies the majority’s conclusion is a mystery to me. Obviously, the Board is subject to the provisions of the Iowa Administrative Procedure Act. This totally begs the question, however, of which provision of the Act — section 17A.19(10)(c) (no deference required) or section 17A.19(10)(£) (deference required) — applies here.
The majority also fails to take into account that the legal requirements at issue — the “need” and “consideration of alternatives” requirements of section 476.53 — are technical matters as to which the Board has more expertise than ourselves. This is not a Renda-type situation involving the interpretation of isolated terms that “have specialized legal meaning and are widely used in [other] areas of law.” Renda, 784 N.W.2d at 14. The majority obscures this point by again citing Webster’s for dictionary definitions of commonplace nonlegal words like “consider,” “other,” “compare,” “feasible,” and “alternatives.” But as before, this retreat into the fortress only gets it so far. Because section 476.53 combines these everyday words with “substantive term[s] within the special expertise of the agency,” id., like “sources for long-term electric supply,” I think we are required to defer to the Board’s interpretations of these provisions taken as a whole, as we have done in our prior utility cases. Iowa Code § 476.53(3).
It is true the majority ultimately sustains the Board’s action in this case. However, its refusal to accord any deference to the Board’s interpretation of utility law is troubling and, if continued, will have adverse implications in future cases.[2]
II. Whether the Project Is Needed and Other Feasible Alternatives Were Considered.
The next question is whether the Wind VII project meets the requirements of section 476.53(3)(c )(2). As noted by my colleagues, the statute requires that the utility have “considered other sources for long-term electric supply” and that the facility be “reasonable when compared to other feasible alternative sources of supply.” Id. at (3)(c)(2). I agree with the Board that this section “does not specifically require consideration of the ‘capacity need’ or ‘energy need’ ... for a proposed facility.” Yet it is implicit in the foregoing language that there be a need for the facility. At some point it would likely *53 raise legal, if not constitutional, problems if a utility built a facility simply to serve nonretail customers while incorporating the costs of that facility into its retail rate base. Having said that, I believe the Board has permissibly interpreted the statute as allowing a broad consideration of the benefits of the facility to retail customers to be taken into account in determining need. Such benefits may include the allocation of lower-cost energy to retail customers, the diversity of energy sources, and the avoidance of potential environmental regulations associated with fossil fuels. In light of this interpretation, I also believe that substantial evidence supports the Board’s factual finding that “MidAmer-ican has established the need for the facility and its benefits to retail customers.”
I do not agree with the Board or the majority, however, that “promoting] economic development” can be cited here as a justification for the order granting advance ratemaking principles to Wind VII. The Board and my colleagues do not explain how Wind VII promotes economic development other than by the fact that MidAmerican will be making a capital expenditure. By this standard, virtually any capital expenditure made by a utility (with the costs borne by the utility’s retail customers) would meet the “need” requirement of section 476.53(3)(c )(2). Notably, neither MidAmerican itself nor the Office of Consumer Advocate cites the economic development justification in its briefing.
Turning to the feasible alternatives issue, the majority appears to conclude that section 476.53 imposes a procedural requirement only. That is, MidAmerican only has to perform a comparison with other energy sources, regardless of what the comparison may show. I disagree. The statute not only requires MidAmeri-can to demonstrate that it “has considered other sources for long-term electric supply,” it also requires MidAmerican to demonstrate that the facility “is reasonable when compared to other feasible alternatives.” Iowa Code § 476.53(3)(c )(2) (emphasis added). The latter is a substantive requirement. Under the Board’s interpretation of this part of section 476.53, with which I agree and to which I defer, the proposed facility must be a “reasonable option.” I believe substantial evidence supports the Board’s finding that it is.[3]
III. Equal Protection.
The equal protection issues here are quite simple.
Iowa law permits a regulated utility (Mi-dAmerican) to build a wind facility and include the costs of that facility in its rate base even though an unregulated utility (NextEra) erecting the same facility would not have the same privilege. See id. § 476.53. Yet NextEra appears to concede that it would not be an equal protection violation if MidAmerican used Wind VII only to supply its local retail customers. Rather, NextEra urges that it violates equal protection if MidAmerican can also compete in the wholesale market with NextEra. In that sense, NextEra is complaining about equal treatment — i.e., the fact that both entities may sell wholesale power — rather than unequal treatment. Notably absent from NextEra’s briefing is any indication that it wishes to become a regulated utility in Iowa.
In any event, MidAmerican has obligations that NextEra does not have. Mi-dAmerican must serve customers within its service area, and its rates are subject to regulation. See id. §§ 476.3, 476.20, *54 476.22-.26. The Board has also indicated that wholesale sales revenue from Wind VII will be included in revenue sharing calculations for ratemaking purposes through 2018, and thereafter, the Board has reserved the question of how the wholesale sales revenue will be treated for ratemaking purposes. Thus, even though both entities may compete in the wholesale market, the legislature could still rationally conclude that the benefits of being a regulated utility are compensated by the drawbacks. Functionally, the constitutional question here is similar to what it was in City of Coralville. In that case, the argument was made that some Coralville residents would receive the benefits of Mi-dAmerican’s undergrounding of power lines without bearing the costs because they were not within MidAmerican’s service area. City of Coralville, 750 N.W.2d at 530. That was alleged to be an equal protection violation. Without much difficulty, we concluded it was not. See id. at 530-81. This case presents an arguably similar situation in that wholesale customers of Wind VII may receive the benefits of the project without having to bear its capital costs in their rate base.
My colleagues conclude that granting advance ratemaking principles for Wind VII will “aid in keeping the price of electricity low for MidAmerican’s retail customers.” I do not think it is necessary or appropriate for us to draw this conclusion. I am not an economist, an expert on finance, or a regulator of utilities. But I am confident that a rational basis exists for the legislature’s determination that Mi-dAmerican can receive advance ratemak-ing principles for this project even though some of the power will be sold on the wholesale market. See King v. State, 818 N.W.2d 1, 2012 WL 1366597 (Iowa 2012) (applying the rational basis test).
IV. Commerce Clause.
The majority’s Commerce Clause discussion is unduly complicated and, in part, incorrect. We do follow the United States Supreme Court’s two-tiered approach to Commerce Clause cases:
When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State’s interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.
Iowa Auto. Dealers Ass’n v. Iowa State Appeal Bd., 420 N.W.2d 460, 462 (Iowa 1988) (quoting Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552, 559 (1986)).
Section 476.53 passes the first threshold because it does not discriminate against out-of-state interests. MidAmerican and NextEra are treated differently not because one is an in-state company and the other is not (indeed, MidAmerican’s ultimate parent is based in Omaha), but because one is a regulated utility and the other is not. So far, I agree with the majority.
However, I believe the majority misapplies the second tier of the analysis, which asks whether the statute unduly burdens interstate commerce. The majority concludes that MidAmerican’s interstate sales of power generated by Wind VII would be a “burden” on interstate commerce but only a “slight” one, outweighed by the “considerable benefits” to local consumers from Wind VII.
*55 Again, given my lack of expertise, I hesitate to predict that Wind VII will be a boon for Iowans served by MidAmerican. But I think we need not reach that question because the majority’s premise is mistaken. How are increased sales in interstate commerce a “burden” on interstate commerce at all?
V. Conclusion.
For the foregoing reasons, I concur in the result only.

. Notwithstanding my colleagues’ statements about not deferring to the Board's legal interpretation of section 476.53, they may be according more deference than they let on. For example, the majority says, "The Board correctly construed section 476.53 to allow it to consider compliance with future environmental regulations, fuel diversity, the volatility of fuel prices, and the supply of less-expensive energy to consumers.” (Emphasis added.) I agree that the Board may, but is not required to, consider these factors in determining whether advance ratemaking principles are appropriate. I support the deferential tone of this statement.

. I agree with the majority and the Board that section 476.43 does not apply here because MidAmerican has met the statutorily required minimum of 105 megawatts.