# IN THE SUPREME COURT OF IOWA

No. 13–0642

Filed July 11, 2014

**SZ ENTERPRISES, LLC d/b/a EAGLE POINT SOLAR,**

Appellee,

vs.

**IOWA UTILITIES BOARD, A DIVISION OF THE DEPARTMENT OF COMMERCE, STATE OF IOWA,**

Appellant,

**INTERSTATE POWER AND LIGHT COMPANY, IOWA ASSOCIATION OF ELECTRIC COOPERATIVES**, and **MIDAMERICAN ENERGY COMPANY,**

Intervenors-Appellants,

**OFFICE OF CONSUMER ADVOCATE, ENVIRONMENTAL LAW & POLICY CENTER, IOWA ENVIRONMENTAL COUNCIL, IOWA SOLAR/SMALL WIND ENERGY TRADE ASSOCIATION, IOWA RENEWABLE ENERGY ASSOCIATION, SOLAR ENERGY INDUSTRIES ASSOCIATION,** and **VOTE SOLAR INITIATIVE,**

Intervenors-Appellees.

---

Appeal from the Iowa District Court for Polk County, Carla Schemmel, Judge.

Utility board appeals district court judgment reversing declaratory ruling of Iowa Utilities Board finding that a solar rooftop company is a public utility, as defined in Iowa Code section 476.1. **AFFIRMED.**

David J. Lynch and Gary D. Stump, Des Moines, for appellant Iowa Utilities Board.

Scott M. Brennan, Deborah M. Tharnish, and Sarah E. Crane of Davis Brown Law Firm, Des Moines, Paula N. Johnson, Cedar Rapids, and Suzan M. Stewart, Sioux City, for appellants Interstate Power and Light Company and MidAmerican Energy Company.

Dennis L. Puckett and Elizabeth N. Overton of Sullivan & Ward, P.C., West Des Moines, for appellant Iowa Association of Electric Cooperatives.


Philip E. Stoffregen, James L. Pray, and Jonathan M. Gallagher of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., Des Moines, for appellee SZ Enterprises, LLC.

Mark R. Schuling, Consumer Advocate, and Jennifer C. Easler, Des Moines, for appellee Office of Consumer Advocate.

Bradley D. Klein, Chicago, Illinois, and Joshua T. Mandelbaum, Des Moines, for appellee intervenors Solar Coalition.

**APPEL, Justice.**

In this case, we consider whether SZ Enterprises, LLC, d/b/a Eagle Point Solar (Eagle Point) may enter into a long term financing agreement related to the construction of a solar energy system on the property of the city of Dubuque under which the city would purchase from Eagle Point, on a per kilowatt hour (kWh) basis, all of the electricity generated by the system. Prior to proceeding with the project, Eagle Point sought a declaratory ruling from the Iowa Utilities Board (the IUB) that under the proposed agreement (1) Eagle Point would not be a "public utility" under Iowa Code section 476.1 (2011), and (2) Eagle Point would not be an "electric utility" under Iowa Code section 476.22. If Eagle Point was a public utility or an electric utility under these Code provisions, it would be prohibited from serving customers, such as the city, who were located within the exclusive service territory of another electric utility, Interstate Power and Light Company (Interstate Power). *See* Iowa Code § 476.25(3).

The IUB concluded that under the proposed business arrangement, Eagle Point would be a public utility and thus was prohibited from selling the electricity to the city under the proposed arrangement. Because of its ruling on the public utilities question, the IUB found it unnecessary to address the question of whether a party who was not a public utility could nevertheless be an electric utility under the statute.

Eagle Point brought a petition for judicial review. *See id.* § 17A.19(1). The district court reversed. According to the district court, Eagle Point's provision of electric power through a "behind the meter" solar facility was not the type of activity which required a conclusion that Eagle Point was a public utility. The district court further found that

although it was conceivable under some circumstances that an entity that was not a public utility could nevertheless be an electric utility under the applicable statutory provisions, Eagle Point's proposed arrangement with the city did not make it an electric utility for purposes of the statutes. The IUB and intervenors MidAmerican Energy Company, Interstate Power, and Iowa Association of Electric Cooperatives, appealed. Eagle Point filed a cross-appeal challenging the reasoning, but not the result, of the district court's electric utility holding.

For the reasons expressed below, we affirm the decision of the district court.

### I. Factual Background and Proceedings.

**A. Introduction.** Eagle Point is in the business of providing design, installation, maintenance, monitoring, operational, and financing assistance services in connection with photovoltaic solar electric (PV) generation systems. The city of Dubuque desires to develop renewable energy for the use of the city.

Eagle Point proposed to enter into a business relationship known as a third-party power purchase agreement (PPA) with the city that would provide the city with renewable energy. Under the PPA, Eagle Point would own, install, operate, and maintain an on-site PV generation system at a city-owned building to supply a portion of the building's electric needs. The city would purchase the full electric output of Eagle Point's solar power generation facility on a per kWh basis, which escalated at a rate of three percent annually. The payments by the city would not only provide consideration for the electricity provided by the project, but would also finance the cost of acquiring the generation system, monetize offsetting renewable energy incentives related to the system, and cover Eagle Point's costs of operating and maintaining the

system. Eagle Point would also own any renewable energy credits associated with the generation system but would credit to the city one third of any revenues received from the sale of those credits. At the conclusion of the agreement, Eagle Point would transfer all ownership rights of the PV generation system to the city.

The PV generation system constructed by Eagle Point would be on the customer side of the electric meter provided by the city's electric utility, Interstate Power. This means that electricity generated by the system would not pass through Interstate Power's electric meter. Due to size limitations, Eagle Point's PV generation system would not be able to generate enough electricity to power the entire building. The city would remain connected to the electric grid and continue to purchase electric power from Interstate Power to meet its remaining needs at the premises.

**B. Proceedings Before the IUB.** Eagle Point filed a petition for a declaratory ruling with the IUB.[1] *See id.* § 17A.9(1)(*a*). Eagle Point sought a declaration from the IUB that it was not a public utility under Iowa Code section 476.1 and was not an electric utility under Iowa Code section 476.22. If Eagle Point was not a public utility or an electric utility under these Code provisions, its proposed relationship with the city would not run afoul of Iowa's statutory scheme that provides for

---

[1]In light of anticipated interest in the issues, the IUB electronically served a notice of the pending proceeding to MidAmerican Energy Company (MidAmerican), Interstate Power, all electric cooperatives, all municipal electric utilities, the Iowa Utility Association, the Iowa Association of Municipal Utilities, and the Iowa Association of Electric Cooperatives. Interstate Power, MidAmerican, the Consumer Advocate Division of the Iowa Department of Justice, the Iowa Association of Electric Cooperatives, the Iowa Association of Municipal Utilities, the Environmental Law & Policy Center, the Iowa Environmental Council, the Iowa Solar/Small Wind Energy Trade Association, the Iowa Renewable Energy Association, the Interstate Renewable Energy Council, Solar City Corporation, Solar Energy Industries Association, Sunrun, Inc., Suntech America, the Vote Solar Initiative, and Winneshiek Energy District all intervened in the administrative proceedings.

exclusive service territories for Iowa's electric utilities. *See id.* § 476.25(3). On the other hand, if Eagle Point were operating as a public utility and an electric utility under these Code provisions, its proposed arrangement with the city would be an unlawful incursion into the exclusive service territory of Interstate Power. *See id.*

The IUB held that under the proposed arrangement, Eagle Point would be acting as a public utility under Iowa Code section 476.1. The IUB recognized that in *Iowa State Commerce Commission v. Northern Natural Gas Co.* [*Northern Natural Gas I*], this court held that in order to be a public utility under Iowa Code section 476.1, the record must show "sales to sufficient of the public to clothe the operation with a public interest and . . . not . . . willingness to sell to each and every one of the public without discrimination." 161 N.W.2d 111, 115 (Iowa 1968). The IUB also noted that in *Northern Natural Gas I* the court referred to an eight-factor test in *Natural Gas Service Co. v. Serv-Yu Cooperative, Inc.*, 219 P.2d 324, 325–26 (Ariz. 1950), to help determine whether the business was "clothed with a public interest." *Northern Natural Gas I,* 161 N.W.2d at 114–16.

The IUB, however, distinguished *Northern Natural Gas I* by noting that the exclusive service territorial statutes applicable to electric utilities do not apply to gas utilities. *See* Iowa Code § 476.25(3). The IUB noted that one of the purposes of exclusive territorial arrangements was to ensure that utilities do not duplicate each other's facilities or make existing facilities unnecessary. *See id.* § 476.25. The IUB also observed that the exception to regulation for self-generation in Iowa Code section 476.1 applies to certain electric utilities but not to gas utilities. Because Eagle Point in the proposed PPA would be selling electricity to the city, the IUB concluded that the requirement of self-generation was not

present. Further, the IUB believed the limited language excluding certain self-generation units from the definition of public utility implies that other arrangements that do not fall within the scope of the exception are necessarily included in the term public utility.

The IUB placed strong emphasis on the fact that unlike the usual arrangement in an ordinary facilities lease, Eagle Point was selling electricity on a per kWh basis. Further, the IUB observed that Eagle Point's promotional materials indicated that it would offer its services to other members of the public and would not limit its activities to the city. While recognizing that there was not always a bright line regarding what activities constitute the activities of a public utility, the IUB concluded that Eagle Point would cross the line if it were allowed to proceed.

Finally, the IUB recognized that it was possible that an entity could be an electric utility without being a public utility. Nonetheless, because the IUB had found that Eagle Point was a public utility, it was not necessary to address the question in this case.

**C. Proceedings Before the District Court.** Eagle Point sought judicial review of the IUB ruling. As a preliminary matter, the district court ruled that IUB's interpretation of the relevant statutes was not entitled to deference under *NextEra Energy Resources LLC v. Iowa Utilities Board*, 815 N.W.2d 30, 36–38 (Iowa 2012) and *Renda v. Iowa Civil Rights Commission*, 784 N.W.2d 8, 14–15 (Iowa 2010). On the merits, the district court concluded that Eagle Point would not be operating either as a public utility or as an electric utility.

In reaching its conclusion that Eagle Point's proposed activities would not bring it within the definition of public utility, the district court noted that the IUB did not apply the analysis of *Northern Natural Gas I* or the eight-factor approach of *Serv-Yu* on the ground that regulation of

electricity was different from regulation of natural gas. Additionally, the district court found that the IUB's analysis of the exception contained in Iowa Code section 476.1 was flawed. According to the district court, the exception did not simply relate to the definition of public utility but provided that all provisions of "this chapter" shall not apply to qualifying self-generation. Thus, the exception was not targeted to the definition of public utility but instead to all aspects of Iowa Code chapter 476. Further, the district court found that the exception at least suggests some willingness on the part of the legislature to allow exceptions for smaller providers.

The district court next considered whether the fact that electric utilities were subject to exclusive territorial provisions provided a basis for distinguishing the *Northern Natural Gas I* case. The district court concluded that there was no basis for this distinction and held that the exclusive territory provisions applied only with respect to electric utilities. The district court reasoned that before the question of whether Eagle Point was an electric utility could be considered, a threshold determination needed to be made on the question of whether Eagle Point was a public utility.

The district court further noted that both gas and electric utilities were included in the same section, Iowa Code section 476.1, where the term "to the public" appears. The district court thus believed any test for determining the meaning of "to the public" should apply both to gas and electric utilities.

Additionally, to the extent the exclusive territorial structure might be considered in determining whether Eagle Point's activities would make it a public utility, the district court believed that the countervailing policy of Iowa Code section 476.41 must be considered. This provision states

that "[i]t is the policy of this state to encourage the development of alternate energy production facilities . . . in order to conserve our finite and expensive energy resources and to provide for their most efficient use." *Id.* § 476.41.

The district court thus concluded that the IUB committed legal error in failing to follow the approach of *Northern Natural Gas I* and its endorsement of the eight-factor approach of *Serv-Yu*. In light of the legal error and the lack of deference to be afforded to the IUB, the district court proceeded to apply the eight *Serv-Yu* factors to the facts of the case.

The district court began its evaluation by noting that it should not consider just one of the *Serv-Yu* factors in isolation, but should engage in a "practical approach," considering "the nature of the actual operations conducted and its effect on the public interest." *Northern Natural Gas Co. v. Iowa Utils. Bd.* (*Northern Natural Gas II*), 679 N.W.2d 629, 633 (Iowa 2004). In order to make such an evaluation, the district court examined each of the eight *Serv-Yu* factors, recognizing that the eight factors were not necessarily controlling of the question of whether Eagle Point was a public utility, but instructive on such question.

The first *Serv-Yu* factor involves consideration of "[w]hat the corporation actually does." *Northern Natural Gas I*, 161 N.W.2d at 115 (quoting *Serv-Yu*, 219 P.2d at 325). The district court concluded that the primary business of Eagle Point was the installation of solar panels and the economic exchange that occurred between Eagle Point and its customers was incidental to what the company "actually does." *Id.* It noted that a behind-the-meter solar facility had the same impact on the customer's demand of the utility-supplied electricity as behind-the-meter energy efficiency technologies, a similarity which the district court observed had previously been recognized by the IUB. *See In re Interstate*

*Power & Light Co.*, Iowa Utils. Bd., Docket No. EEP-2008-0001 at 11 (June 24, 2009), *available at* https://efs.iowa.gov/cs/groups/ external/documents/docket/mdaw/mdq0/~edisp/016067.pdf ("The Board can discern no difference between the use of renewable technologies and classic energy efficiency measures when those activities take place on the customers' side of the meter."). The district court found the IUB's distinction between behind-the-meter electrical generation by a customer and by a third party as lacking the "practical" analysis required by *Northern Natural Gas II*. *See* 679 N.W.2d at 633. The district court believed that whether a behind-the-meter energy project was structured as a PPA or a lease did not change the essential character of the project or what Eagle Point "actually does." Therefore, the district court found this factor did not favor a finding that Eagle Point was a public utility.

The second *Serv-Yu* factor involves "a dedication to public use." *Northern Natural Gas I*, 161 N.W.2d at 115 (quoting *Serv-Yu*, 219 P.2d at 325). The district court concluded that the case only involved a sale to a single customer on a single site. Eagle Point did not provide service to a large segment of the population, nor was its activities integral to the provision of electricity to the public at large. As a result, the second *Serv-Yu* factor favored a finding that Eagle Point was not a public utility.

The third *Serv-Yu* factor involves the "[a]rticles of incorporation, authorization, and purposes" of the entity. *Id.* (quoting *Serv-Yu*, 219 P.2d at 325). The district court found this factor to be unhelpful and somewhat irrelevant, concluding that there was no evidence of any intent to act as a public utility to the public at large in Eagle Point's certificate or organization, its operating agreement, or its sales brochures.

The fourth *Serv-Yu* factor is whether the activity is "[d]ealing with the service of a commodity in which the public has been generally held to have an interest." *Id.* (quoting *Serv-Yu,* 219 P.2d at 326). The district court recognized that this factor might seem to cut in favor of a determination that Eagle Point was a public utility but noted that the electricity provided was not dependent upon any common facilities that served the public and was generated and consumed behind the meter on the customer's premises. A shutdown of Eagle Point facilities would be far less serious than the effects of a shutdown of services by electric utilities such as Interstate Power. The district court did not specifically evaluate the impact of the fourth *Serv-Yu* factor, but seemed to suggest that while it tipped in favor of a finding that Eagle Point would be a public utility, the impact of the factor was substantially weakened as a result of the behind-the-meter context.

The fifth *Serv-Yu* factor is "[m]onopolizing or intending to monopolize the territory with a public service commodity." *Id.* (quoting *Serv-Yu,* 219 P.2d at 326). The district court found that third-party renewable energy developers were not "natural monopolies," like electric and natural gas providers, and that there was ample competition in the marketplace. Further, the fact that the host always had an electric utility to fall back upon ensured that PPAs would not produce unbalanced bargaining power. The district court therefore found that this factor weighed against finding Eagle Point to be a public utility.

The sixth *Serv–Yu* factor is "[a]cceptance of substantially all requests for service." *Id.* (quoting *Serv-Yu,* 219 P.2d at 326). The district court concluded that the record was inadequate to address this point and made no conclusions related to it.

The seventh *Serv-Yu* factor states that "[s]ervice under contracts and reserving the right to discriminate is not always controlling." *Id.* The district court noted that the PPA involved in this case was an individually detailed contract. Further, the district court observed that Eagle Point certainly retained the right to discriminate with whom it contracted. The district court found the seventh *Serv-Yu* factor weighed against a finding that Eagle Point would be a public utility under the PPA.

The last *Serv-Yu* factor is "[a]ctual or potential competition with other corporations whose business is clothed with public interest." *Id.* (quoting *Serv-Yu*, 219 P.2d at 326). Here, the district court found some degree of competition, but noted that Eagle Point would never be able to totally replace the electricity provided by Interstate Power. The district court stated that Eagle Point was not trying to replace or sever the relationship between Interstate Power and the city. The district court thus did not believe this factor would weigh in favor of finding Eagle Point to be a public utility.

Based on the nature of Eagle Point's actual operations, their effect on the public interest, an evaluation of the eight *Serv-Yu* factors and Iowa's legislative policies supporting energy conservation and renewable energy development, the district court concluded that Eagle Point did not furnish electricity to the public and thus was not a public utility.

The next question confronted by the district court was whether Eagle Point nevertheless might be considered an electric utility under Iowa Code section 476.22 even though it was not a public utility under Iowa Code section 476.1. The relevant section of 476.22 provides that an " 'electric utility' includes a public utility furnishing electricity as defined in section 476.1 and a city utility as defined in section 390.1." *Id.* As all

parties agreed that Eagle Point was not a "city utility" under section 390.1, the sole issue was whether the term electric utility in context here could have a broader meaning than public utility under Iowa Code section 476.1. While the district court, like the IUB, recognized the theoretical possibility that an entity could be an electric utility without being a public utility, the district court held that nothing in this case was sufficient to sustain the expanded interpretation. The court therefore concluded that Eagle Point was not an electric utility as defined in section 476.22 and as used in the exclusive service territory statutes in sections 476.23–.26.

## II. Standard of Review.

**A. Introduction**. Iowa Code section 17A.19(10) controls judicial review of an agency decision. *See Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004). In reviewing an agency interpretation of statutory provisions, the initial question is "whether the legislature clearly vested the agency with the authority to interpret the statute at issue." *NextEra*, 815 N.W.2d at 36. If we determine that the legislature has vested such authority with the IUB, we defer to the agency's interpretation of the statute and will reverse the agency's interpretation only if it is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*); *Renda,* 784 N.W.2d at 10. If we determine that the legislature did not vest the IUB with authority to interpret the statute, then our review is for errors at law and we therefore are not bound by the agency's interpretation and may substitute our own to correct a misapplication of law. Iowa Code § 17A.19(10)(*c*); *NextEra,* 815 N.W.2d at 37; *Meyer v. IBP, Inc.*, 710 N.W.2d 213, 219 (Iowa 2006).

**B.    Positions of the Parties.**    The IUB[2] maintains that it is entitled to deference in its interpretation of the terms public utility and electric utility contained in sections 476.1 and 476.22 respectively.  It recognized that in *NextEra*, this court held that the IUB was not entitled to deference with respect to the statutory interpretation questions raised in that case.  815 N.W.2d at 38.  The IUB asserts, however, that a different result should occur here because unlike the statutory language involved in *NextEra*, the terms public utility and electric utility are substantive terms within the specific expertise of the IUB.  It further argues that the question of subject matter jurisdiction requires an understanding of complex technical issues such as the purpose of the exclusive service territory statute and whether Eagle Point's proposed project would undermine economical, efficient, and adequate electric service to the public.

While the IUB concedes that the legislature has provided a definition for the terms public utility and electric utility, a factor which ordinarily cuts against a finding that the legislature vested deference with the agency, the IUB argues that this factor alone is not determinative.  *See Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762–63 (Iowa 2011).  It further draws our attention to a number of other cases where we have granted deference to the IUB in a variety of contexts.  *See, e.g., City of Coralville v. Iowa Utils. Bd.*, 750 N.W.2d 523, 527 (Iowa 2008) (holding the IUB's interpretation of "rates and services" in section 467.1(1) was entitled to deference); *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643 (Iowa 2008)

---

[2]The IUB and parties aligned with it will collectively be referred to as the IUB in this opinion.

(interpreting the "unauthorized-change-in-service" provisions in section 476.103); *AT&T Commc'ns of the Midwest, Inc. v. Iowa Utils. Bd.*, 687 N.W.2d 554, 561 (Iowa 2004) (per curiam) (holding the IUB's interpretation of section 476.101(9) was entitled to deference).

Eagle Point[3] believes the IUB is not entitled to deference in its interpretation of the statutory terms involved in this case. It points to our statement in *Renda* that " '[n]ormally, the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly.' " 784 N.W.2d at 11 (quoting Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 62 (1998) [hereinafter Bonfield]). In addition, Eagle Point contends that the vesting of the IUB with rulemaking authority does not necessarily mean that the IUB has interpretive power under the statute. *See NextEra*, 815 N.W.2d at 38.

Eagle Point further notes the legislature provided specific definitions for public utility and electric utility in the statute, an important factor militating against a finding that the IUB is vested with interpretive power. *See Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 145 (Iowa 2013); *Sherwin-Williams Co. v. Iowa Dep't of Revenue*, 789 N.W.2d 417, 423–24 (Iowa 2010). In any event, Eagle Point argues that the terms "public utility" and "electric utility" are not specialized and that the court has already interpreted the term "public utility" without giving deference to the agency. *See Renda*, 784 N.W.2d at 14. Further, Eagle Point notes that the term "public utility" is used in other sections of the

---

[3]Eagle Point and parties aligned with it will collectively be referred to as Eagle Point in this opinion.

Code and that it is important to have a uniform meaning established through judicial decision rather than a specialized and differentiated meaning determined by the IUB. *See id.*

**C. Analysis of Deference Issue.** We begin our analysis with a recognition that principles established in *Renda* suggest we should not give interpretive deference to the IUB in this case. *Renda* states that as a general proposition, agencies are not given deference by this court to an interpretation of law without some clear indication that the general assembly intended this result. *Id.* at 11. In addition, we noted in *Renda* and a number of other cases that where the general assembly provides an agency with a definition of legal terms in a statutory provision, the use of definitions is a significant factor weighing against an interpretation requiring deference. *See id.* at 12; *Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d ___, ___ (Iowa 2014); *Iowa Dental Ass'n*, 831 N.W.2d at 145; *Sherwin-Williams*, 789 N.W.2d at 423–24. Finally, in *Renda*, we noted that the use of statutory terms that are not highly specialized, but are used in other sections of the Code, point in the direction of lack of deference. *See* 784 N.W.2d at 14.

We do not conclude that these principles mean that the IUB will never be granted deference. We focus on the particular statutory provision at issue in a given case. *See id.* at 13. Even where definitions have been supplied by the legislature and the terms are not terms of art, we leave open the possibility that the structure or subject matter of the legislation is of sufficient complexity to require that this court defer to agency legal interpretations. *See id.* at 14. We do believe, however, that parties seeking to require this court to defer to legal determinations of the IUB face an uphill battle where, as in this case, the legislature has

provided definitions of terms that do not on their face appear to be technical in nature.

We do not believe that the IUB or parties arguing in support of its decision have made the case for deference. At the outset,[4] we note that no provision in chapter 476 explicitly grants the agency the authority to interpret the terms "public utility" and "electric utility." *See NextEra*, 815 N.W.2d at 37–38 ("[S]imply because the general assembly granted the [IUB] broad general powers to carry out the purposes of chapter 476 and granted it rulemaking authority does not necessarily indicate the legislature clearly vested authority in the [IUB] to interpret all of chapter 476."); *see also Hawkeye Land Co.*, 847 N.W.2d at ___; *Renda*, 784 N.W.2d at 14 ("[B]road articulations of an agency's authority or lack of authority should of avoided in the absence of an express grant of broad interpretive authority."). Further, after reviewing the " 'language of the statute, its context, . . . purpose . . . and the practical considerations involved,' " we are not "*firmly* convinced" the legislature intended to vest the IUB with authority to interpret the terms at issue here. *Renda*, 784 N.W.2d at 14 (quoting Bonfield, at 63) (emphasis added). Two sub-conclusions lead us to this determination.

First, the legislature has provided a definition for both "public utility" and "electric utility," a significant factor weighing against

---

[4]"Deciding whether language contained in a statute applies to a dispute is clearly an interpretation of law." *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 260 (Iowa 2012), *see also Renda*, 784 N.W.2d at 11–14.

> In order to properly review the agency's interpretation of section [476.22], including the definition of the term '[public utility]' referenced therein, we must first determine whether the legislature has clearly vested the [agency] with the authority to interpret section [476.22] and to determine when and how that section applies to a given dispute.

*Burton*, 813 N.W.2d at 260.

requiring deference. *See* Iowa Code § 476.1; *id.* § 476.22; *Hawkeye Land Co.*, 847 N.W.2d at ___; *Iowa Dental Ass'n*, 831 N.W.2d at 145 ("[T]he legislature has provided its own definition of the term at issue. This presents an 'insurmountable obstacle' to a determination that the insurance commissioner has been vested with interpretive authority over 'covered services.' Instead, it indicates we ought to apply the legislative definition ourselves." (quoting *Sherwin-Williams Co.*, 789 N.W.2d at 422–24)); *Sherwin-Williams Co.*, 789 N.W.2d at 423–24 ("The insurmountable obstacle to finding the department [of revenue] has authority to interpret the word 'manufacturer' in this context is the fact that this word has already been interpreted, i.e., explained, by the legislature through its enactment of a statutory definition."). Additionally, in interpreting former chapter 490A, now chapter 476, the court gave no deference to the agency's interpretation of "public utility." *See Northern Natural Gas I*, 161 N.W.2d at 113 ("The legislature has defined public utility for the purposes of Chapter 490A . . . . We therefore start with the familiar statement that the legislature is its own lexicographer when it deems it advisable to define a word or phrase.").

Second, the terms "public utility" and "electric utility" are not very complex and are not "uniquely within the subject matter expertise of the agency", as they are used elsewhere in the Code. *See Renda*, 784 N.W.2d at 14; *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 344 (Iowa 2013). While the IUB decides some highly complex and technical terms under Iowa Code chapter 476 that require this court to defer with respect to the IUB's legal interpretations, *see, e.g., City of Coralville*, 750 N.W.2d at 527 ("rates and services" in section 476.1); *Office of Consumer Advocate*, 744 N.W.2d at 643 ("unauthorized-change-in-service" in

section 476.103), we can determine the scope of the legislatively defined terms in this case without any unusual expertise.

Additionally, as the *Gartner* court explained, "[t]hese terms are not exclusively within the expertise of the [IUB]." 830 N.W.2d at 344. "Instead, the legislature utilized these terms throughout the Iowa Code." *Id.* "For instance, the term ['public utility'] appears in statutes that the [IUB] has no role in enforcing." *Id.*; *see, e.g.,* Iowa Code §§ 412.5, 422.93, 480A.2(4).

Further, in our recent decision *Hawkeye Land Co.*, we concluded that the IUB was not entitled to deference with respect to its determination that a company involved in electrical transmission lines was a public utility under Iowa Code section 476.1. 847 N.W.2d at ___. We see no basis to depart from that approach here.

For these reasons, we conclude that under *Renda* principles as applied in *Hawkeye Land Co.* and other cases, the legal interpretations of the IUB in this case are not subject to deference by this court. *See Hawkeye Land Co.*, 847 N.W.2d at ___; *Renda*, 784 N.W.2d at 14. As a result, the legal issues presented in this appeal must be decided by us de novo. *See* Iowa Code § 17A.19(10)(*c*); *Renda*, 784 N.W.2d at 14–15.

**III.  Background of Third-Party PPAs and Public Utility Regulation.**

**A.  Introduction to the Third-Party PPA.** Traditionally, electricity has been provided in the United States by large enterprises that made heavy capital investments to provide power over transmission lines to customers. *See* Gregory C. Jantz, Note and Comment, *Incentives for Electric Generation Infrastructure Development*, 2 Tex. J. Oil, Gas, & Energy L. 373, 373–77 (2007) (describing the country's electricity market before the 1990s). Over time, the utilities providing electric service came

to be highly regulated in order to advance the public interest and to limit the effects of monopoly or near monopoly power on consumers. *See id.* at 375–77 (describing regulatory developments in the last quarter of the twentieth century).

In recent decades, however, the traditional approach has been challenged by several developments. First, there has been an increased belief in deregulation and competitive marketplaces generally. *See* Consumer Energy Council of America Research Foundation, *Restructuring the Electric Utility Industry: A Consumer Perspective* 3 (1998). Deregulation in the airline, natural gas, telephone, trucking, and railroad industries has been largely accomplished, and although deregulation of public utilities providing energy has not proceeded in a similar fashion, support for the regulated monopoly approach has been questioned more recently than in the past decades. *Id.*

In addition, the desire to promote alternate energy sources seen as more environmentally friendly has contributed to the search for alternate models of energy delivery. The federal government has promoted investment in alternate energy facilities by providing powerful tax incentives, including a thirty-percent investment tax credit in certain types of "energy property" and accelerated tax depreciation deductions for alternate energy projects. *See* Mark Bolinger, Lawrence Berkeley Nat'l Lab., *Financing Non-Residential Photovoltaic Projects: Options and Implications* i (2009), *available at* http://emp.lbl.gov/sites/all/files/REPORT%20lbnl-1410e.pdf [hereinafter Bolinger] (noting the thirty-percent investment tax credit and accelerated tax depreciation provided to commercial PV generation systems); Richard Martinson, *Federal Tax Legislation Favors Alternative Energy Development and Energy Efficiency Initiatives*, N.J. Law., June 2011, at 22–24. *See*

*generally* James W. Moeller, *Of Credits and Quotas: Federal Tax Incentives for Renewable Resources, State Renewable Portfolio Standards, and the Evolution of Proposals for a Federal Renewable Energy Portfolio Standard*, 15 Fordham Envtl. L. Rev. 69 (2004).

Finally, in the field of PV generation, technological advances have made it increasingly feasible to install generation capacity at the source of consumption without use of centralized power generation and extended transmission lines. *See* Samual Farkas, Student Comment, *Third-Party PPAs: Unleashing America's Solar Potential*, 28 J. Land Use & Envtl. L. 91, 92–93 (2012) [hereinafter Farkas]. These decentralized retail generation projects are located "on the customer's side of the meter." *Id.* at 93. The sheer number of such solar energy facilities has thus grown rapidly in recent years. *See* Bolinger, at i. (noting compound annual growth rate between 2000 and 2007 of fifty-nine percent for grid-connected PV systems).

As detailed in a recent technical report published by the United States Department of Energy, however, there are significant barriers to the installation of on-site solar energy facilities. *See* Katharine Kollins, et al., Nat'l Renewable Energy Lab., U.S. Dep't of Energy, *Solar PV Project Financing: Regulatory and Legislative Challenges for Third-Party PPA System Owners* 1, 3, 33–35 (2010), *available at* http://www.nrel.gov/docs/fy10osti/46723.pdf [hereinafter Kollins]. Most prominently, the initial capital costs remain quite high, often in the millions of dollars or more. *See id.* at 3; Farkas, 28 J. Land Use & Envtl. L. at 93, 98. Entities that do not pay taxes, such as government or nonprofit organizations, cannot even offset these costs by realizing the economic benefits of favorable tax treatment of alternative energy investments. *See* Farkas, 28 J. Land Use & Envtl. L. at 100. Additionally, some potential PV

investors are weary of unpredictable fluctuations in electricity prices and are concerned about their ability to provide maintenance and upkeep for facilities driven by unfamiliar technology. *See* Kollins, at 34.

In order to overcome these barriers, proponents of alternate energy facilities have developed a method of financing construction of solar facilities called third-party power purchase agreements, or PPAs. *See id.* at 3, 33–35. Under the PPA model, the developer builds and owns the PV generation system, which is constructed on the customer's site. *Id.* at 3. The developer–owner then sells the electric power to the consumer at a preestablished fixed rate, thereby providing the customer with a hedge against price increases from the traditional electric utility serving the location. *See id.* at 33–34. PPAs thus minimize the up-front cost barrier, *see id.* at 33, and greatly stabilize, if not reduce, costs for the consumer thereafter, Farkas, 28 J. Land Use & Envtl. L. at 99. In addition, the developer–owner is ordinarily a private income-generating entity able to take advantage of the tax benefits afforded to alternative energy development. *See* Kollins, at 33–34. Moreover, the developer–owner, who maintains the system, is an expert with PV technology. *Id.* at 34. Thus, under a PPA, the developer–owner absorbs the high initial costs, retains the responsibility of maintenance of the system, and is compensated based on electricity actually produced by the system.

A fundamental legal question, however, is whether PPAs may coexist with traditional public utilities within the existing state regulatory environment. A threshold question is often whether the developer–owner in a third-party PPA is a public utility or electric supplier subject to state regulation. This definitional question often turns on whether the developer–owner in a third-party PPA is regarded as furnishing or supplying electricity "to the public."

The consequences of this threshold determination are critical to the viability of third-party PPAs. In states where public utilities have exclusive service areas, a finding that a PPA is a public utility generally means that a PPA violates the exclusive territory provisions of state law and is thus unlawful. *See, e.g.*, Iowa Code §§ 476.1, .22, .25(3). In states where public utilities do not have exclusive service areas, the consequence is that PPAs may be subject to substantial regulation as a public utility, including requirements to submit tariffs and to provide service to all who desire it. *See, e.g.*, N.H. Rev. Stat. Ann. § 374-F:4(111) (LexisNexis 2008).

**B. State Caselaw on What Constitutes a "Public Utility" Providing Services "to the Public."** The notion that private entities may be so affected by the public interests that public duties arise from their activities has ancient common law origins. For example, at common law, mills provided essential services to medieval inhabitants and gave rise to a common law duty to serve. *See* Jim Rossi, *The Common Law "Duty to Serve" and Protection of Consumers in an Age of Competitive Retail Public Utility Restructuring*, 51 Vand. L. Rev. 1233, 1244–45 (1998). Medieval subsistence farmers without access to the mill went hungry and, as a result, duties to serve were imposed. *See id.* The common law duty to serve was later extended to ferries, markets and other essential enterprises. *Id.* at 1245.

The common law tradition has influenced some state courts when construing statutes defining public utilities or service to the public. One line of authority relies on the notion that in order to be a public utility serving the public generally, the entity must directly or indirectly hold itself out as providing service to all comers. *See, e.g., City of Englewood v. City & Cnty. of Denver*, 229 P.2d 667, 672–73 (Colo. 1951), *abrogated*

*by statute, as recognized in Bd. of Cnty. Comm'rs v. Denver Bd. of Water Comm'rs*, 718 P.2d 235, 244 (Colo. 1986). Under this theory, a business that provides sporadic services of a commodity that might ordinarily be associated with a public utility might not be drawn within the ambit of regulation. *See id.* at 673 ("The nature of the service must be such that all members of the public have an enforceable right to demand it."); *Mississippi River Fuel Corp. v. Ill. Commerce Comm'n,* 116 N.E.2d 394, 399 (Ill. 1953) ("Selling gas to a limited group of industrial customers cannot properly be characterized as devoting property to a 'public use.' ").

On the other hand, a different line of authority has developed a more flexible notion of what amounts to a public utility. These cases use a functional approach and concentrate on the nature of the underlying service and whether there is a sufficient public need for regulation. *See, e.g., Indus. Gas Co. v. Pub. Utils. Comm'n,* 21 N.E.2d 166, 168 (Ohio 1939) (holding "[a] corporation that serves such a substantial part of the public as to make its rates, charges, and methods of operations a matter of public concern, welfare and interest subjects itself to regulation"); *Serv-Yu,* 219 P.2d at 325–26 (applying eight factors to assist in determination of whether public interest requires regulation).

**C.** **Iowa Caselaw on What Constitutes a "Public Utility" Providing Services "to the Public."** The current Iowa public utilities regime was enacted in 1963. 1963 Iowa Acts ch. 286 (codified as amended at Iowa Code ch. 476 (2011)); *see Iowa-Illinois Gas & Elec. Co.,* 125 Iowa 1029, 1034, 129 N.W. 832, 835 (1964). Our first case considering the meaning of public utility for purposes of the statute was *Northern Natural Gas I.* In *Northern Natural Gas I,* we considered whether a gas company with more than five thousand miles of pipeline within the state and with almost 1800 retail customers was a public utility. 161

N.W.2d at 112, 113–15. We held that it was. *Id.* at 115. In doing so, we favorably cited *Serv-Yu* and its eight factors. *See id.* We concluded that the term "to the public" as used in the statute meant "sales to sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination." *Id.* We specifically rejected what we called the "rigid test" of the Colorado cases. *Id.* at 116.

In finding the plaintiff to be furnishing gas to the public, we noted in *Northern Natural Gas I* that

> (1) [p]laintiff [dealt] in a commodity in which the public as a whole is generally interested, (2) it [was] actually engaged in supplying its commodity to some of the public[, and] (3) [i]t served a substantial portion of the public.

*Id.* Yet, we suggested in *Northern Natural Gas I* that anticipated expansion to large numbers may determine the outcome. *See id.*

Three justices dissented in *Northern Natural Gas I*. *Id.* at 119 (Stuart, J., dissenting). The dissenters argued that the phrase "to the public" meant to the public and not individualized contractual sales. *Id.* at 121. The dissenters asserted that the approach to the phrase "to the public" was not consistent with the commonly accepted meaning of public sales and public service. *Id.* at 119. The dissenting justices embraced the traditional common law view that a public utility had a duty to serve members of the public. *Id.* at 121.

Ten years ago we revisited the issue in *Northern Natural Gas II*. In that case, we recognized that while the traditional approach may have been construed as requiring indiscriminate offer of services to the public, the court took a different path in *Northern Natural Gas I*. *Northern Natural Gas II*, 679 N.W.2d at 633. We reaffirmed that in order to resolve the question of whether a certain activity was clothed with sufficient

public interest to qualify as sales "to the public," a "practical," multifactored approach was required to determine the issue. *Id.*; *see also State ex rel. Utils. Comm'n v. Simpson*, 246 S.E.2d 753, 757 (N.C. 1978) (noting the Iowa Supreme Court's approach in *Northern Natural Gas I,* "[i]s [the] type of flexible interpretation that is necessary to comport legislative purpose with the variable nature of modern technology"). We expressed the conservative principle, however, that to the extent there might be a sufficient public interest to support regulation, jurisdiction should be extended "only as necessary to address the public interest implicated." *Northern Natural Gas II*, 679 N.W.2d at 633.

**D. State Precedents on Whether Third-Party PPAs Are Subject to Regulation as "Public Utilities."**

1. *Decisions holding PPAs are public utilities subject to state regulation.* In *PW Ventures, Inc. v. Nichols*, the Florida Supreme Court considered whether a cogeneration project proposed by PW Ventures for an industrial site amounted to a public utility under a Florida statute. 533 So. 2d 281, 283–84 (Fla. 1988). The statutory provision defined a " 'public utility' " as " 'every person . . . supplying electricity . . . to or for the public within this state.' " *Id.* at 282–83 (quoting Fla. Stat. § 366.02(1) (1985)). Under the proposed agreement, PW Ventures would construct, own, and operate the project on land leased from the site. *Id.* at 282. PW Ventures would then sell its output to the industrial site under a long-term contract. *Id.* The Florida Public Service Commission held that PW Ventures would be a public utility under the proposed contract. *Id.* at 283. PW Ventures appealed.

The Florida Supreme Court characterized the question of whether PW Ventures would be a public utility as "not without doubt." *Id.* The

court noted, however, that under applicable law, it applies a deferential review to Public Service Commission decisions and would not depart from them unless "clearly unauthorized or erroneous." *Id.*

Applying the "clearly unauthorized or erroneous" standard, the Florida Supreme Court upheld the decision of the Public Service Commission. *Id.* at 284. It noted that the legislature had granted express exemptions from regulation for natural gas suppliers who market wholesale or direct to industrial customers and for water and sewer systems that serve fewer than one hundred persons, but that the legislature did not provide a similar exemption for electrical suppliers. *Id.* at 283.

The Florida Supreme Court also noted that the decision of the Public Service Commission was consistent with "the granting of monopolies in the public interest." *Id.* The Florida Supreme Court emphasized that PW Ventures proposed "to go into an area served by a utility and take one of its major customers." *Id.* The court observed that "[t]he effect of this practice [is] that revenue that otherwise would have gone to the regulated utilities which serve the affected areas would be diverted to unregulated producers." *Id.* Further, according to the court, if PW Ventures were to prevail, nothing would prevent "one utility company from forming a subsidiary and raiding large industrial clients within areas served by another utility." *Id.* at 283 n.5.

One Florida justice dissented. *Id.* at 284 (McDonald J., dissenting). According to the dissent, the phrase "to the public" in the applicable Florida statute did not mean a sale to a single industrial host, but instead to the people as a whole. *Id.* According to the dissent, providing electricity to a single industrial customer was plainly insufficient. *Id.* at 284–85.

2. *Decisions holding PPAs are not public utilities subject to state regulation.* Aside from *PW Ventures*, the parties have not cited, and we have not found, appellate caselaw on the question of whether the developer-owner under a PPA is a public utility within the scope of regulatory statutes. There are, however, a number of regulatory decisions that address the issue. Several of them—Arizona, Nevada, New Mexico, and Oregon—have come to the conclusion that the developer–owners of PPAs are not public utilities under applicable statutes or constitutional provisions. *See In re Application of SolarCity Corp.*, Ariz. Corp. Comm'n, Docket No. E-20690A-09-0346, at 69–70 (July 12, 2010), *available at* http://images.edocket.azcc.gov/docketpdf/ 0000114068.pdf; *Order*, Pub. Utils. Comm'n of Nevada, Docket No. 07-06027, at 12 (Nov. 26, 2008); *In re A Declaratory Order Regarding Third-Party Arrangements for Renewable Energy Generation*, N.M. Pub. Reg. Comm'n, Case No. 09-00217-UT, at 13 (Dec. 30, 2009), *available at* http://www.nmprc.state.nm.us/commissioners/jasonmarks/docs/Third %2520Party%2520Order.pdf; *Honeywell Int'l, Inc. v. PacifiCorp*, Pub. Util. Comm'n of Oregon, Docket No. DR 40, Order No. 08-388, at 15 (July 31, 2008), *available at* http://apps.puc.state.or.us/orders/2008ords/08-388.pdf; *see also* Kollins, at 11–13 (cataloging state administrative decisions).

We begin with a review of the decision of the Arizona Corporation Commission in *SolarCity*. In *SolarCity*, a developer sought a declaratory ruling that its method of providing solar facilities to the Scottsdale United School District did not amount to a "public service corporation" under article 15, section 2 of the Arizona Constitution. *Solar City*, Docket No. E-20690A-09-0346, at 3. Under the stated facts, SolarCity proposed to enter into what it called a solar services agreement (SSA) whereby it

would pay the upfront expenses associated with construction of the solar facility. *Id.* at 5–6. The customer would pay SolarCity "for the design, installation, and maintenance of the system based on the amount of electricity produced." *Id.* at 6. Unlike ordinary PPAs, the SSA explicitly provided that the customer was the "owner" of all electricity produced by the system. *Id.* SolarCity structured the agreement in order to comply with federal tax law and allow SolarCity to take advantage of available tax benefits. *Id.* The question posed was whether under the proposed transaction SolarCity would come within the scope of article 15, section 2 of the Arizona Constitution, which provides that a "corporation[] . . . engaged in furnishing . . . electricity . . . shall be deemed [a] public service corporation[]." *Id.* at 7.

Arizona appellate court precedent provides that analysis under article 15, section 2 involves a two-step process. *Sw. Transmission Coop., Inc. v. Ariz. Corp. Comm'n (SWTC)*, 142 P.3d 1240, 1243 (Ariz. Ct. App. 2006). The first step is to determine whether an entity meets the textual definition of a "public service corporation." *Id.* Merely meeting the textual definition is not enough. *Id.* at 1244. In addition, an entity's business and activities

> must be such as to make its rates, charges and methods of operation, a matter of public concern, clothed with a public interest to the extent contemplated by law which subjects it to governmental control—its business must be of such a nature that competition might lead to abuse detrimental to the public interest.

*Id.* at 1244–45.

On the first question, the Arizona Corporation Commission determined that SolarCity was "furnishing electricity" to its customer. *SolarCity*, Docket No. E-20690A-09-0346, at 24–25. It noted that the purpose of the relationship was to sell or provide electricity. *Id.* at 24. It

rejected the notion that the contractual language relating to ownership of electricity was material to evaluation of the transaction, noting that SolarCity cannot "own" the equipment for tax purposes and then claim it did not "own" the electricity for purposes of regulation. *Id.* The commission found that at first, "the SSA transaction may appear to meet the textual definition of a public service corporation under the Constitution." *Id.* at 25. "However, SolarCity is not in the business of selling electricity, but rather, is in the business of designing, financing, installing, and monitoring solar systems for residential and commercial customers" and therefore "[f]urther consideration must be given to the public interest and the entity's primary business purpose, activities and methods of operation." *Id.*

The commission next turned to considering the second question in its analysis, namely, whether the entity's business and activities were sufficiently "clothed with the public interest" to trigger regulation. *Id.* at 25–53. Here, the commission applied the *Serv-Yu Factors*. *Id.* In *SWTC*, the Arizona Supreme Court acknowledged that in *Serv-Yu*, the Arizona Supreme Court announced eight factors to be considered in determining whether an entity was "clothed with a public interest" and subject to regulation because they were "indispensible to [the] population." 142 P.3d at 1244, 1245. The eight factors are:

(1) What the corporation actually does.

(2) A dedication to public use.

(3) Articles of incorporation, authorization, and purposes.

(4) Dealing with the service of a commodity in which the public has been generally held to have an interest.

(5) Monopolizing or intending to monopolize the territory with a public service commodity.

(6) Acceptance of substantially all requests for service.

(7) Service under contracts and reserving the right to discriminate is not always controlling.

(8) Actual or potential competition with other corporations whose business is clothed with the public interest.

*Id.* at 1244.

Applying the *Serv-Yu* factors, the Arizona Corporation Commission concluded that SolarCity was not "clothed with a public interest" sufficient to draw it within the scope of regulation. *SolarCity*, Docket No. E-20690A-09-0346, at 52–53. In reaching this conclusion, the Commission noted that (1) SolarCity did not "affect so considerable a fraction of the public," did not seek to "stand in the place of the underlying utility," and did not provide continued service to the customer (*Serv-Yu* factor 1); (2) the activity of SolarCity was "not integral to the public at large" (*Serv-Yu* factor 2); (3) SolarCity's articles of incorporation did "not reflect an intent to act as a public service corporation" (*Serv-Yu* factor 3); (4) SSAs never generated more than fifty percent of the power of the host and the ramifications of a shutdown were far less than that of a regulated utility (*Serv-Yu* factor 4); (5) SolarCity did not hold itself out to all customers and was not capable of providing comprehensive service that could expand into a monopoly (*Serv-Yu* factor 5); (6) SolarCity must compete with other suppliers and thus did not accept most, if not all requests for service (*Serv-Yu* factor 6); (7) SolarCity used individualized contracts counterbalanced by broad business solicitation (*Serv-Yu* factor 7); and (8) although SolarCity providers displaced power sales by incumbent utilities, they did not replace existing utilities and assist them to reach distributed generation goals (*Serv-Yu* factor 8). *See id.* at 30–31, 36, 37, 42, 46, 48, 49–50, 52.

The question of whether a PPA involving solar energy was subject to regulation as a "public utility" was also confronted by the New Mexico Public Regulation Commission. *See generally In re a Declaratory Order Regarding Third-Party Arrangements for Renewable Energy Generation*, N.M. Pub. Reg. Comm'n, Case No. 09-00217-UT. In this request for a declaratory order, the New Mexico Public Regulation Commission considered "under what circumstances . . . a developer contracting with an electric utility customer to provide supplemental electricity become[s] an electric utility within the meaning of the [New Mexico Statute Annotated section 62-3-3(G)(1) (2009)]." *Id.* at 7. The commission determined the key to this question was the meaning of the phrase "to the public" in the statute, which provided that a " 'public utility' or 'utility' means every person . . . that may own, operate, lease or control . . . any plant, property or facility for generation, . . . sale or furnishing to or for the public of electricity." *Id.* The commission rejected a bright-line test based on the number of customers. *Id.* at 7–8.

Relying on a case of the Supreme Court of New Mexico (which itself relied heavily on *Northern Natural Gas I*), the commission stated that in order to be considered a public utility under the statute, the sales must involve " 'sufficient of the public to clothe the operation with a public interest.' " *Id.* at 9 (quoting *Griffith v. N.M. Pub. Serv. Comm'n*, 520 P.2d 269, 272 (N.M. 1974)). It relied on New Mexico caselaw, however, to conclude that in order to be clothed with a public interest, creating an expectation of "a legal right to demand and receive . . . services" is the principle determinative feature of a public utility. *Id.* at 10 (quoting *El Vadito de los Cerrillos Water Ass'n v. New Mexico Pub. Serv. Comm'n*, 858 P.2d 1263, 1269 (N.M. 1993) (emphasis removed)). Further, the commission noted that PPAs were only providing a supplemental service.

*Id.* at 11. Additionally, the commission noted that the fact that developers placed advertisements in the Albuquerque Journal and elsewhere did not constitute "holding out" to the general public and was therefore insufficient to clothe their operations with the public interest. *Id.* at 12.

Finally, the commission held that a "third party developer who owns renewable generation equipment, which is installed on a utility customer's premises, and uses this equipment to serve multiple customers for a portion of each customer's electricity use and, payments for which are based on a kilowatt-hour charge, is not a public utility subject to regulation by the Commission." *Id.* at 13.

3. *States resolving the issue through legislative action.* A number of states have resolved the status of third-party PPAs by enacting legislation explicitly addressing the issue. For example, in California, Public Utilities Code section 218 specifically exempts from regulation

> a corporation or person employing cogeneration technology or producing power from other than a conventional power source for the generation of electricity solely for . . . . [t]he use of or sale to not more than two other corporations or persons solely for use on the real property on which the electricity is generated.

Cal. Pub. Util. Code § 218(b)(2) (West 2004). California has been a leader in the development of third-party PPAs, including significant government-owned projects, like the Moscone Center in San Francisco. *See* Moscone Center, *Sustainability*, https://www.moscone.com/ community/sustain.html (2009) (last visited July 10, 2014) ("One of the nation's largest municipally-owned solar generation installations now operates from the roof of the Moscone Center.").

New Jersey has also legislated in this area. Under its public utility statutes, a "basic generation service provider" is an electric generation

service provided "to any customer that has not chosen an alternative electric power supplier." N.J. Stat. Ann. § 48:3-51 (West Supp. 2014). "Electric generation service" is the "provision of retail electric energy and capacity which is generated *off-site from the location at which the consumption of such electric energy and capacity is metered for retail billing purposes.*" *Id.* (emphasis added).

> Similarly, Colorado Revised Statute section 40-1-103 provides that

> [t]he supply of electricity . . . from solar generating equipment located on the site of the consumer's property, which is owned or operated by an entity other than the consumer, [is not a public utility provided that the supply generated is] no more than one hundred twenty percent of the average annual consumption of the electricity [from that site].

Colo. Rev. Stat. § 40-1-103(2)(c) (2013).

In Iowa, there has been recent legislative activity related to the issue. In 2013, H.F. 226 was introduced which explicitly stated that third-party PPAs related to "alternate energy aggregation projects" would not be considered "public utilities" and would not violate the exclusive territory provisions of section 476.25. H.F. 226, § 1, 85th Gen. Assemb., Reg. Sess. (Iowa 2013). The legislation, however, was not enacted.

**E. Overview of Legal Issues in This Case**. There are three legal issues presented in this case for our de novo review. As is often the case, the issues are layered and interconnected.

The first legal issue is whether Eagle Point should be considered a public utility under Iowa Code section 476.1. This Code section provides:

> As used in this chapter, "*public utility*" shall include any person, partnership, business association, or corporation, domestic or foreign, owning or operating any facilities for:

> 1. Furnishing gas by piped distribution system or electricity to the public for compensation.

*Id.* § 476.1. If we conclude that the facts presented in the declaratory proceeding establish that Eagle Point is a public utility, we must next consider whether it escapes regulation as a result of an exception provided in Iowa Code section 476.1. This exception removes from chapter regulation certain types of electric utilities:

> This chapter does not apply . . . to a person *furnishing electricity* to five or fewer customers either by secondary line or from an alternate energy production facility or small hydro facility, from electricity that is produced *primarily for the person's own use.*

*Id.* § 476.1 (emphasis added). If Eagle Point is a "public utility" and does not come within the scope of the exemption, its proposed arrangement will run afoul of the exclusive territory provisions of section 476.25(3):

> An electric utility shall not serve or offer to serve electric customers in an exclusive service area assigned to another electric utility, nor shall an electric utility construct facilities to serve electric customers in an exclusive service area assigned to another electric utility.

*Id.* § 476.25(3). The exclusive-territory provision is designed "to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." *Id.* § 476.25.

If we determine that Eagle Point should not be considered a public utility or qualifies for the applicable exemption, we must then next consider whether Eagle Point is an electric utility under Iowa Code section 476.22. This section provides:

> As used in sections 476.23 to 476.26 (exclusive territory provisions), unless the context otherwise requires, *"electric utility"* includes a public utility furnishing electricity as

defined in section 476.1 and a city utility as defined in section 390.1.

*Id.* The argument is that electric utility could be broader than the term public utility because the context of the exclusive territorial provisions compels a broader gloss on the term than is generally applied. If Eagle Point is an electric utility under Iowa Code section 476.22, its proposed third-party PPA would run afoul of the exclusive territory provisions of Iowa Code section 476.25.

**IV. Is Eagle Point a Public Utility Under Iowa Code Section 476.1?**

**A. Positions of the Parties**

1. *The IUB.*

*a. Plain language analysis.* The IUB maintains Eagle Point is a public utility under the plain language of Iowa Code section 476.1. It notes that Eagle Point, under its proposed agreement with the city, will "operate, install, own, maintain, and finance" the solar facility. It further notes that Eagle Point is compensated based upon the production of electricity arising from the solar facility. According to the IUB, that should be the end of the story under the terms of the statute: Eagle Point is "furnishing" electricity "to the public for compensation." *See* Iowa Code § 476.1. It asserts that the district court erroneously focused on the end results of energy efficiency rather than the nature of the transaction itself, which plainly involves the sale of electricity.

*b. Potential for expansion.* The IUB takes the position that even one transaction involving the sale of electricity makes Eagle Point a public utility. In any event, the IUB notes that there is no limitation to the potential activities of Eagle Point and that its marketing materials indicate a desire to expand its business. The IUB stresses that

commercial retailers as well as government entities may use the PPA model to reduce energy costs and reduce their environmental footprint. The IUB believes the green light in the district court order could lead to a dramatic expansion of third-party PPAs that would be "clothed with the public interest." Further, the district court order could even allow back door deregulation by allowing behind-the-meter fossil fuel generation.

*c. Misapplication of* Serv-Yu's *factors.* The IUB maintains that the district court erred in its application of the *Serv-Yu* factors. According to the IUB, selling electricity on a per kWh basis is an understandable test superior to the vague application of the *Serv-Yu* factors. The IUB recognizes that in *Northern Natural Gas I,* this court cited the *Serv-Yu* factors in determining whether sales of nature gas came within the scope of the term "public utility." *See Northern Natural Gas I,* 161 N.W.2d at 114–15. The IUB claims, however, that the utilities furnishing electricity have exclusive territories while providers of natural gas do not. The IUB thus seeks to sever *Serv-Yu* factors from consideration of what a public utility is in the context of providing electricity under Iowa Code section 476.1.

In any event, the IUB argues that the *Serv-Yu* factors were misapplied by the district court. For example, the IUB claims the district court's analysis ignored the fact that the activities of PPAs reduce the demand for the product of regulated monopolies, thereby reducing the utilities' ability to recover the reasonable costs of providing service to the public. As a result, they contend, the shortfall must be recovered from other retail customers in the form of higher rates.

*d. Exception demonstrates coverage.* The IUB notes that the exception to the definition of public utility in Iowa Code section 476.1 supports its position. It argues that the exception excludes from the

definition of public utility a person furnishing electricity to five or fewer customers if the power is produced "for the person's own use." *See* Iowa Code § 476.1. The IUB asserts that this exception demonstrates that the legislature considered the question of whether on-site generation should be regulated, and deliberately crafted a narrow provision that does not include on-site generation where the electricity is sold to the host. Further, it is suggested that if on-site, behind-the-meter facilities were excluded from the definition of public utilities, there would be no need for the exception.

*e. Public interest in exclusive territories.* In addition to these arguments, the IUB notes that the regulatory regime under chapter 476 would be compromised if Eagle Point were found not to be a public utility. It argues that if Eagle Point were allowed to proceed with its third-party PPA, it could "cherry pick" large commercial customers, thus upsetting the settled expectations of Interstate Power, which has been granted exclusive territory as part of the regulation of electric power by the IUB. The IUB notes that the purpose of the granting of exclusive territory is to establish the basis for the creation of a stable electric grid and to ensure that all customers, large and small, receive reliable electric power at an affordable price. Further, Interstate Power, as the exclusive provider of electric power in the territory, which includes the city, has made investment decisions based upon its status as a regulated monopoly. In addition, allowing the third-party PPA arrangement would lead to an unnecessary duplication of services, with both the exclusive territorial provider and the PPA providing facilities for the generation of electric power to the same customer.

In support of the argument that the Eagle Point project offends the exclusive territory policy underlying Iowa Code section 476.25, the IUB

and parties supporting it, point to *PW Ventures, Inc.*, 533 So. 2d at 281. In that case, PW Ventures proposed to construct, own, and operate a "cogeneration project"[5] on land leased from Pratt and sell the resulting electric power to the company. 533 So. 2d at 282. As in this case, PW Ventures sought a declaratory ruling in advance that it would not be subject to the regulatory jurisdiction of the Florida Public Service Commission. *Id.* The relevant legislation defined public utility as any entity "supplying" electricity to or for the public within the state. *Id.* at 282–83. The Florida Supreme Court found that even the sale of electricity to one customer was sufficient to establish sale "to the public." *Id.* at 283. The Florida Supreme Court further upheld a determination by the Florida Public Service Commission that PW Ventures would be a public utility, noting among other things that the Commission's interpretation was consistent with a legislative scheme which contemplated the granting of monopolies in the public interest. *Id.*

*f. Impermissible consideration of independent promotion of alternative energy.* The IUB argues that the ruling of the district court in this case was based not upon the language and structure of Iowa Code chapter 476, but instead upon (1) a general desire to further renewable energy options, and (2) a desire to allow the city to take advantage of certain tax incentives that are not otherwise available.

The IUB recognizes that under Iowa Code section 476.41, the state has embraced a policy of encouraging the development of alternate energy. The IUB argues, however, Iowa Code section 476.41 is not a general stand alone provision authorizing any and all kinds of alternate energy projects. Instead, in order to advance the important policy goal

---

[5]"Cogeneration involves the use of steam power to produce electricity, with some of the energy from the steam being recaptured for further use." *Id.* at 282 n.3.

embraced in Iowa Code section 476.41, the IUB maintains that the legislature enacted Iowa Code sections 476.42 through 476.48. For example, section 476.44 requires rate-regulated utilities to purchase 105 megawatts of electricity "from alternate energy production facilities or small hydro facilities." *See* Iowa Code § 476.44(2)(*a*). There is a difference, the IUB claims, between alternate energy acquired pursuant to section 476.44 and by the regulated public utilities. Public utilities must coordinate their overall production strategy, and independent alternate energy efforts, that may undermine the planning inherent in a regulated monopoly setting. In short, energy conservation proposals arising from alternate energy, according to the IUB, must generally be integrated with the regulated monopoly in order to allow for the coordinated, planned provision of electricity to customers.

2. *Eagle Point.*

*a. Emphasis on practical evaluation of nature of "sales to the public" requiring protection of customers rather than "furnishing electricity".* Eagle Point suggests that the key element in determination of whether an entity is operating as a public utility under Iowa Code section 476.1 is the nature of sales and not merely the fact that the entity might be supplying a commodity subject to regulation. The focus, they argue, citing United States Supreme Court precedent, is on "the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared." *Charles Wolff Packing Co. v. Court of Indust. Relations*, 262 U.S. 522, 539, 43 S. Ct. 630, 634, 67 L. Ed. 1103, 1110 (1923). Eagle Point notes that in *Northern Natural Gas I*, the court did not simply determine that the sales of gas by piped distribution was dispositive of the issue. Instead, the court emphasized that the "real question" was the meaning of the statutory phrase "to the public." 161

N.W.2d at 115. The *Northern Natural Gas I* court stated that the test to determine whether there were sufficient sales to compromise a public utility was whether the sales were "clothed with [the] public interest." *Id.* In order to make that determination, there must be an examination of "the nature of the actual operations conducted and its effect on the public interest." *Northern Natural Gas II*, 679 N.W.2d at 634. Eagle Point notes that the court in *Northern Natural Gas I* cited the eight-factor test in *Serv-Yu* to assist it in making its determination. *See* 161 N.W.2d at 115. It further cites administrative proceedings in Arizona, New Mexico, and Hawaii for the proposition that such third-party financing does not trigger regulation of the offering entity as a public utility.

Eagle Point notes that the IUB in this case focused on the "per kWh" nature as the "key factor in determining that Eagle Point would be a public utility under section 476.1." But in *Northern Natural Gas I*, there was no question that sales of gas were involved, but that was not the end of the analysis. The teaching of *Northern Natural Gas I* and the above authorities, according to Eagle Point, is that in order to determine whether an entity is engaging in activities that draw it within the scope of the statute, a broader examination is required. Eagle Point elaborates on this theme by emphasizing that the key focus of utility regulation is to protect customers from entities that sell indispensable products, not the need to protect regulated utilities from competition from nonutilities.

*b. Application of consumer-protection-oriented Serv-Yu factors.* Having established that a broader analysis is required, Eagle Point argues that the district court correctly applied the *Serv-Yu* factors in determining that Eagle Point was not a public utility. They march through the *Serv-Yu* factors and assert that (1) the primary business of Eagle Point is to install solar panels, not sell electricity (*Serv-Yu* factor 1);

Eagle Point's activities are "behind the meter" and therefore are not "dedicated" to public use and involve no public infrastructure (*Serv-Yu* factor 2); the record shows no evidence of intent to be a public utility (*Serv-Yu* factor 3); the provision of solar panels and equipment is not an "indispensible service" and does not involve captive customers, but instead involves voluntary private choices in a competitive market (*Serv-Yu* factor 4); there is no natural monopoly in the market for solar facilities (*Serv-Yu* factor 5); the obvious fact that Eagle Point cannot serve all customers because of environmental and rooftop conditions (*Serv-Yu* factor 6); Eagle Point provides services through individually negotiated, private contracts with variable terms and site specific services (*Serv-Yu* factor 7); and Eagle Point's capacity to provide electricity to the city is limited and the city will remain connected to the grid (*Serv-Yu* factor 8).

Eagle Point asserts that the third-party PPA structure should be regarded as a long-term financing arrangement rather than a transaction involving the furnishing of electricity. In support of the argument, it cites *Iowa-Illinois Gas & Elec. v. Iowa State Commerce Comm'n*, 334 N.W.2d 748 (Iowa 1983). In that case, we held that the statutory predecessor of the IUB lacked the power to promulgate rules requiring a utility to provide financing for energy conservation and renewal resource measures as part of the utility service. *Id.* Eagle Point argues that it would be absurd to hold that public utilities cannot be required to provide financing for energy conservation and renewal resource measures, and then say that Eagle Point is a public utility when it provides such services.

c. *Lack of merit in Serv-Yu factor Eight: Effect on regulated utilities.* In reaching its decision, the IUB relied extensively on the impact Eagle Point's business could have on the regulated utility, Interstate Power.

Eagle Point notes that the IUB emphasized that the activities of Eagle Point will lead to higher electric rates, backdoor reregulation, and unnecessary duplication of services.

Eagle Point and its supporters assert that the evidence in the record simply does not support these assertions. The dire predictions, according to Eagle Point, have not manifested in the states that allow PPA financing. Eagle Point asserts that there is no evidence in the record to show that PPAs cause higher utility rates. On the contrary, Eagle Point suggests that rooftop solar provides significant benefits to the grid because it provides power during "peak" periods when the sun is shining and air conditioning is running.

*d. Experience in other states.* Eagle Point argues that the experience in other states allowing PPAs supports its position. It notes the regulatory commissions in Arizona and New Mexico support its view that approval of PPAs does not destabilize the regulated electric industry.

*e. Promotion of energy efficiency.* Eagle Point argues that Iowa Code section 476.41 expresses a strong Iowa public policy in favor of promoting energy conservation. It notes that the IUB itself in administrative proceedings and in its brief in this case has recognized that "reducing energy and capacity demands on [Iowa Power & Light's] system is the core of energy efficiency."

**B. Failure to Apply *Northern Natural Gas* and *Serv-Yu* Factors**. We now consider whether the IUB applied the correct legal standard when it determined that Eagle Point's proposed third-party PPA with the city would bring it within the term public utility under Iowa Code section 476.1.

We begin with observing that we believe the standard for determining whether a gas or electric provider is a public utility under

the statute must be the same. The definition of "public utility" in Iowa Code section 476.1 from its inception in 1963 applied both to gas and electric providers. *See* 1963 Iowa Acts ch. 286. We see no basis in the statute for applying one test for gas suppliers and another for providers of electricity.

It is true, of course, as the IUB points out, that electric utilities are subject to the exclusive territorial provisions of Iowa Code sections 476.22–.26, while gas suppliers are not. We note, however, that the definition of public utility was part of the original 1963 legislation while the provisions relating to exclusive territories for electric providers was added in 1977. *Compare* 1963 Iowa Acts ch. 286, *with* Iowa Code § 476.22–.26 (1977). At the time the exclusivity language was added to the code, no change was made in the definitional provision of Iowa Code section 476.1. *Compare* Iowa Code § 476.22–.26 (1977), *with* Iowa Code § 476.1 (1977). We do not believe the adding of additional language in 1977 related to exclusivity altered the meaning of the statutory definitions which preexisted in the Code.

In *Northern Natural Gas I,* we emphasized that "to the public" meant "sales to sufficient of the public" to "clothe the operation with a public interest." 161 N.W.2d at 115. In order to determine whether the sales were clothed with the public interest, we utilized the eight-factor *Serv-Yu* test. *See id.* at 114–15.

Past precedent of the IUB reveals that the IUB too has endorsed the *Northern Natural Gas I* test. In *Hawkeye Land Co. v. ITC Midwest,* the IUB cited *Northern Natural Gas I* as the "appropriate" test in a case involving the construction of electric transmission lines. *In re Hawkeye Land Co. v. ITC Midwest LLC*, Iowa Utils. Bd., Docket No. FCU-2009-0006, at 38 (Sept. 30, 2011), *available at* https://efs.iowa.gov/cs/

groups/external/documents/docket/mdaw/mte2/~edisp/079153.pdf. This court subsequently applied the *Northern Natural Gas I* test when the decision of the IUB was appealed. *Hawkeye Land Co.*, 847 N.W.2d at ___.

A review of the IUB decision in this case reveals that the IUB did not undertake the analysis required by *Northern Natural Gas I* and the *Serv-Yu* factors, but instead sought to apply a different bright-line test, namely, a test that whenever an entity sold electricity on a per kWh basis, it would be, as a matter of law, a public utility.

We decline to introduce such an innovation into our established law. The very purpose of *Northern Natural Gas I* was to escape a rigid test that required a finding that an entity was involved in providing a commodity in a fashion that gave rise to a duty to serve all members of the public. Having abandoned the rigid test influenced by the common law, we do not think the proper approach is to substitute another equally rigid test at the other end of the spectrum. Indeed, under the IUB approach, a behind-the-meter solar generating project built by an engineering class at Iowa State University that furnished electricity on a per kWh basis to a nearby farm would be considered a public utility subject to a wide gamut of regulatory requirements. Even if the students obtained a waiver of the territorial exclusivity of the local electric utility, students would be required to stay after class to handle the paperwork associated with filing tariffs with the IUB.

We reject the approach of the IUB in this case. Instead, based on our straight line of cases from *Northern Natural Gas I* through *Northern Natural Gas II* and *Hawkeye Land Co.*, we conclude that the proper test is to examine the facts of a particular transaction on a case-by-case basis to determine whether the transaction cries out for public

regulation. We believe the *Serv-Yu* factors provide a reasoned approach when considering the question of whether the activity involved is sufficiently clothed with the public interest to justify regulation.

**C. Proper Application of *Northern Natural Gas* and *Serv-Yu* Factors**. Before examining the *Serv-Yu* factors individually, we note generally two different types of considerations which could give rise to a public interest in the transaction. On the one hand, there could be a public interest in regulating the transaction between the developer–owner in a third-party PPA and the consumer. This type of public interest usually arises because the provider of the public utility, due to the nature of the service and the barriers to entry, is often in a vastly superior bargaining position compared to the consumer. *See Chas. Wolff Packing Co.*, 262 U.S. at 538, 43 S. Ct. at 634, 67 L. Ed. at 1110. On the other hand, because the commodities involved may be essential to commerce or everyday life, the continued provision of the service on a reliable basis may trigger a public interest. *See* Iowa Code § 476.25.

We now move to consideration of the *Serv-Yu* factors. The first factor requires a pragmatic assessment of what is actually happening in the transaction. *See Northern Natural Gas I*, 161 N.W.2d at 115. The transaction may be characterized as a sale of electricity or a method of financing a solar rooftop operation. Neither characterization is inaccurate. But most importantly, we have little doubt that the transaction is an arms-length transaction between a willing buyer and a willing seller. There is no reason to suspect any unusual potential for abuse. From a consumer protection standpoint, there is no reason to impose regulation on this type of individualized and negotiated transaction.

We also note that the IUB would not seek to regulate behind-the-meter solar installations that are owned by the host or which operate pursuant to a standard lease.[6] If this is true, the actual issue here is not the supplying of electricity through behind-the-meter solar facilities, but the method of financing. Yet, financing of renewable energy methods is not something that public utilities are required to do. *See Iowa-Illinois Gas & Elec.*, 334 N.W.2d at 753–54. As pointed out by the Consumer Advocate in this case, if providing financing for renewable energy is not required of public utilities, the converse should also be true, namely, that providing financing for solar activities should not draw an entity into the fly trap of public regulation.

With respect to the second *Serv-Yu* factor, we agree with the district court that it cannot be said that the solar panels on the city's rooftop are dedicated to public use. *See Northern Natural Gas I*, 161 P.2d at 115. The installation is no more dedicated to public use than the thermal windows or extra layers of insulation in the building itself. The behind-the-meter solar generating facility represents a private transaction between Eagle Point and the city.[7]

On the fourth *Serv-Yu* factor, it seems clear that the provisions of on-site solar energy are not an indispensable service that ordinarily cries out for public regulation. *See id.* All of Eagle Point's customers remain connected to the public grid, so if for some reason the solar system fails, no one goes without electric service. Although some may wish it so,

---

[6]Interestingly, the city and Eagle Point have converted their financial relationship in connection with the behind-the-meter solar generating facility in this case from a third-party PPA to a standard lease arrangement in order to remove the shadow of the legal cloud raised by this case.

[7]Like the district court, we pass over the third *Serv-Yu* factor as inconclusive.

behind-the-meter solar equipment is not an essential commodity required by all members of the public. It is, instead, an option for those who seek to lessen their utility bills or who desire to promote "green" energy. You can take it or leave it, and, so far, it seems, many leave it.

The fifth *Serv-Yu* factor relating to monopoly clearly cuts against a finding that Eagle Point is a public utility. *See id.* There is simply nothing in the record to suggest that Eagle Point is a six hundred pound economic gorilla that has cornered defenseless city leaders in Dubuque. Indeed, the nature of the third-party PPA suggests the opposite, as the city has entered into what amounts to be a low risk transaction—it owes nothing unless the contraption on its rooftop actually produces valuable electricity.

The sixth and seventh *Serv-Yu* factors relate to the ability to accept all requests for service and, conversely, the ability to discriminate among members of the public. *See id.* These twin factors cut in favor of finding that Eagle Point is not a public utility. Eagle Point is not producing a fungible commodity that everyone needs. It is not producing a substance like water that everyone old or young will drink, or natural gas necessary to run the farms throughout the county. More specifically, Eagle Point is not providing electricity to a grid that all may plug into to power their devices and associated "aps," or, more prosaically, their ovens, refrigerators, and lights.

Instead, Eagle Point is providing a customized service to individual customers. Whether Eagle Point can even provide the service will depend on a number of factors, including the size and structure of the rooftop, the presence of shade or obstructions, and the electrical use profile of the potential customer. Further, if Eagle Point decides not to engage in a transaction with a customer, the customer is not left high and dry, but

may seek another vendor while continuing to be served by a regulated electric utility. These are not characteristics ordinarily associated with activity "clothed with a public interest."

The eighth *Serv-Yu* factor is perhaps the most interesting. Under the eighth factor, the actual or potential competition with other corporations whose business is clothed with the public interest is considered. *See id.* Here, the IUB strenuously argues that allowing third-party PPAs will have decidedly negative impacts on regulated electric utilities charged with providing reliable electricity at a fair price to the public. In support of its view, the IUB cites *PW Ventures*. The fighting issue in this case is whether factor eight in the *Serv-Yu* litany trumps the preceding factors and requires that Eagle Point be treated as a public utility providing services to the public.

The position of the IUB has considerable appeal. Certainly, the case can be made that if Eagle Point is allowed to "cream skim" the most profitable customers, there may be impacts on the regulated utility. *See E. Shore Natural Gas Co. v. Del. Pub. Serv. Comm'n*, 635 A.2d 1273, 1281 (Del. Sup. Ct. 1993) (recognizing that providing gas service to select industrial customers affected public interest because of potentially "destructive competition"); *PW Ventures*, 533 So. 2d at 283 (public interest implicated where revenue that "otherwise would have gone to the regulated utilities" is "diverted to unregulated producers"); *In re S. Jersey Gas Co.*, 544 A.2d 402, 406 (N.J. Sup. Ct. App. Div. 1988) (using a cream-skimming analogy); *Indus. Gas Co.*, 21 N.E.2d at 168 (finding business that seeks to provide service to select industrial customers is a public utility). If the third-party-PPA movement gets legs in Iowa, it is conceivable that demand for electricity from traditional utilities will be materially impacted in the long run. There is nothing in the record of

this administrative proceeding, however, to gauge the likelihood or degree of material impact, and there was no suggestion that the integrity of the grid or economic health of regulated providers has been adversely affected in states such as California, Nevada, Arizona, and Colorado, where third-party PPAs are not considered public utilities for purposes of regulation.

There are also mitigating factors. As pointed out by Eagle Point, it does not seek to replace the traditional electric supplier but only to reduce demand. Although an Eagle Point sale brochure promoting its services is in the record, there is nothing to suggest that its services will be attractive to, or even practical to, many customers of the traditional electric supplier. Further, the parties to third-party PPAs have the ability to convert their business arrangements into conventional leases which are outside the scope of regulation. Indeed, in this case, Eagle Point and the city have done just that to avoid unnecessary legal entanglements.

In addition to mitigating factors, there are also countervailing positive impacts. Behind-the-meter solar facilities tend to generate electricity during peak hours when the grid is under the greatest pressure. Further, Iowa Code section 476.8 requires regulated electric utilities to provide reasonably adequate service, and such service must "include[] programs for customers to encourage the use of energy efficiency and renewable energy sources." Thus, third-party PPAs like the one proposed by Eagle Point actually further one of the goals of regulated electric companies, namely, the use of energy efficient and renewable energy sources. *See, e.g.*, *SolarCity*, Docket No. E-20690A-09-0346, at 37, 39.

In the end, whether an activity is sufficient to draw an entity within the scope of utilities regulation is a matter of assessing the

strength of the *Serv-Yu* factors on a case-by-case basis. The weighing of *Serv-Yu* factors is not a mathematical exercise but instead poses a question of practical judgment. *See Northern Natural Gas II,* 679 N.W.2d at 633. In our view, in this case, the balance of factors point away from a finding that the third-party PPA for a behind-the-meter solar generation facility is sufficiently "clothed with the public interest" to trigger regulation.

### V. Is Eagle Point an Electric Utility under Iowa Code Section 476.22.

#### A. Positions of the Parties.

1. *The IUB.* The IUB argues that under *Renda,* the legislature intended to vest authority with the IUB to determine whether an entity is an electric utility under Iowa Code section 476.22. The IUB notes that this Code provision provides "unless the context provides otherwise," an electric utility "includes a public utility furnishing electricity as defined in section 476.1." Iowa Code § 476.22. The IUB notes that the statute uses the term "includes," therefore suggesting that there might be situations where an entity which is not a public utility could be an electric utility. *Eyecare v. Dep't of Human Servs.,* 770 N.W.2d 832, 837 (Iowa 2009) ("Generally 'the verb "includes" imports a general class, some of whose particular instances are those specified in the definition.' " (quoting *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 126 n.1, 55 S. Ct. 60, 62 n.1, 79 L. Ed. 232, 235 n.1 (1934))).

The IUB then reprises much of its argument regarding the importance of exclusivity in the provision of electric power. The IUB emphasizes the statutory goal of avoiding duplication of services, which will occur if third-party PPAs are not considered electric utilities within the scope of Iowa Code section 476.22. The IUB theorizes that if such

behind-the-meter generation is allowed, the public utility will be left with excess generation capability which represents a cost that must be passed on to ratepayers. The IUB argues that because of the nature and goals of the exclusivity provisions, Eagle Point should be considered an electric utility under Iowa Code section 476.22, even if it is not a public utility under section 476.1.

In any event, the IUB urges that the matter be remanded to the Commission. It notes that in its earlier ruling, the IUB did not address the issue. The IUB argues that because its interpretation of law is entitled to deference under *Renda*, it is entitled to a first crack at the issue, which should not be decided by an appellate court on appeal.

2. *Eagle Point.* Eagle Point counters that there is a basis for concluding that the definition of electric utility in Iowa Code section 476.22 is *broader* than public utility. Indeed, Eagle Point argues that the purpose of the phrase "unless the context otherwise requires" is a term of limitation. Under Eagle Point's view, a public utility furnishing electricity under Iowa Code section 476.1 might not be an electric utility under Iowa Code section 476.22, depending upon context. Eagle Point notes that various city utilities which might be drawn into Iowa Code section 476.22 are plainly not electric utilities—such as waterworks, sanitary sewage systems, etc. The phrase "unless the context requires otherwise," according to Eagle Point, allows an escape for city utilities that plainly have nothing to do with the provision of electricity. Eagle Point's cross-appeal challenges the language of the district court order indicating it is conceivable, under some circumstances, that the term "electric utility" is broader than the term "public utility."

Eagle Point also raises an issue of issue preservation. It notes that no one before the IUB argued that the term "electric utility" was broader

than "public utility." It suggests that this court should not be swayed by what amounts to "post hoc rationalizations" by counsel on appeal. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 246, 9 L. Ed. 2d 207, 216 (1962). In any event, Eagle Point sees no basis for an extraordinary interpretation of the term "electric utility" under the facts and circumstances of this case.

**B. Discussion of the Merits.** Based upon the language of the statute, we are inclined to believe that the phrase "unless the context otherwise requires" is a term of limitation designed to ensure that city utilities that do not furnish electricity are not inadvertently drawn into the statute. It is true, however, that the term "includes" can generally imply that there are other situations outside the literal language of the descriptors in the statute that might be within its scope.

The problem for the IUB, however, is that it has not offered a clear explanation as to why Eagle Point should be considered an electric utility even if it is not a public utility. The IUB asserts that the exclusive territory provisions require that the definition of electric utility should be broader than public utility, but we do not agree. The argument presented by IUB seems to be an effort to evade application of the *Serv-Yu* factors. We decline to adopt such an interpretation.[8]

---

[8]The IUB notes that it did not rule on this issue and urges a remand if we determine that Eagle Point is not a public utility. We would consider a remand if we determined that the legal determinations of the IUB were entitled to deference, but because they are not, there is no obstacle to us deciding the legal issue raised on appeal. *See Renda*, 784 N.W.2d at 11 ("Normally, the interpretation of a statute is a pure question of law over which agencies are not delegated any special powers by the General Assembly so, a court is free to, and usually does, substitute its judgment *de novo* for that of the agency . . . ." (quoting Bonfield, at 62)); *Meyer*, 710 N.W.2d at 219 ("If the findings of fact are not challenged, but the claim of error lies with the agency's interpretation of the *law*, the question on review is whether the agency's interpretation was erroneous, and we may substitute our interpretation for the agency's."). Further, " '[w]here the [agency] has not reached certain issues because they were deemed unnecessary to the decision under the rationale it elected to invoke, we may in the interest of sound judicial administration decide the issues where they have been fully

### VI. Conclusion.

For all the above reasons, the decision of the district court is affirmed.

**AFFIRMED.**

All justices concur except Mansfield and Waterman, JJ., who dissent and Zager, J., who takes no part.

---

briefed and argued.' " *IBP, Inc. v. Burress*, 779 N.W.2d 210, 218 (Iowa 2010) (quoting *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 378 (Iowa 1986)). The additional issue here was fully briefed before the agency and the factual record is complete.

**MANSFIELD, Justice (dissenting).**

I respectfully dissent and would uphold the determination of the Iowa Utilities Board (the Board) that Eagle Point Solar (Eagle Point) is a public utility. To my mind, the majority opinion is a good case study on the limits of judicial competence and why the legislature wanted us to defer, in large part, to the regulatory agency.

As I read the majority opinion, my colleagues appear to be substituting their expertise on utility regulation for that of the Board. Consider the following excerpts:

> There are, however, significant barriers to the installation of on-site solar energy facilities. The initial capital costs remain quite high, often in the millions of dollars or more. Some potential risk averse customers are skeptical about the ability of solar facilities to provide regular and predictable sources of energy. . . .
>
> . . . .
>
> . . . There is no reason to suspect any unusual potential for abuse. From a consumer protection standpoint, there is no reason to impose regulation on this type of individualized and negotiated transaction.
>
> . . . .
>
> . . . [T]he provisions of on-site solar energy are not an indispensable service that ordinarily cries out for public regulation. All of Eagle Point's customers remain connected to the public grid, so if for some reason the solar system fails, no one goes without electric service. Although some may wish it so, behind the meter solar equipment is not an essential commodity required by all members of the public. . . .
>
> . . . .
>
> In addition to mitigating factors, there are also countervailing positive impacts, too. Behind the meter solar facilities tend to generate electricity during peak hours when the grid is under the greatest pressure.

(Citations omitted.)

For each of these statements, the majority provides either no supporting authority or citations to material that the majority presumably found in its own independent research.[9] Is it the proper role of courts to act as experts on the delivery of electrical energy? I would argue it is not.

The basic issue in this case is whether Eagle Point becomes a public utility under Iowa Code section 476.1 (2011) when it goes into the business of installing on-site solar energy facilities on various entities' properties and selling the resulting electricity to those entities. I can see reasonable arguments on both sides.

The Board, after extensive proceedings, concluded that Eagle Point would become a public utility. Among other things, the Board noted that Eagle Point would be selling electricity on a per-kilowatt-hour basis to multiple customers; that this electricity would displace electricity normally provided by the public utility required to serve that territory; and that such an arrangement would undermine the trade-off whereby the local regulated utility has the obligation to serve every customer that wants service but in return receives an exclusive territory. As the Board points out on appeal, if Eagle Point is allowed to take electricity sales away from Interstate Power and Light (Interstate Power), which has made long-term investments based on projections of customer demand and which is authorized by law to recover its costs plus a reasonable rate of return, Interstate Power's other ratepayers could be forced to make up the difference.

---

[9]The majority opinion has many citations to nonlegal sources. These sources do not come from the record or the parties' briefs.

These arguments could be wrong. My colleagues believe they are wrong. But I do not believe we should be deciding them.

In *Renda v. Iowa Civil Rights Commission,* we undertook a comprehensive review of the administrative law question that underlies this appeal. *See* 784 N.W.2d 8, 10–15 (Iowa 2010). Thus, we discussed at length when courts should and should not defer under Iowa Code section 17A.19 to an agency's interpretation of statutory terms. *Id.*

As we emphasized in *Renda,* "when the statutory provision being interpreted is a substantive term within the special expertise of the agency, we have concluded that the agency has been vested with the authority to interpret the provisions." *Id.* at 14. In fact, among the cases we cited with approval in *Renda* after making this statement was *City of Coralville v. Iowa Utilities Board.* *Renda,* 784 N.W.2d at 12, 14 (citing *City of Coralville v. Iowa Utils. Bd.,* 750 N.W.2d 523, 527 (Iowa 2008)). In *City of Coralville,* we held that public utility "rates and services" as used in Iowa Code section 476.1 was clearly vested in the Board's interpretive discretion. *See City of Coralville,* 750 N.W.2d at 527.

Applying this standard from *Renda,* I think it would be hard to conceive of a substantive term more within the special expertise of the Board than whether a company providing electric service is operating as a "public utility."

*Renda* also discussed another situation where agency deference has historically been granted by courts. This is when an agency has been given rulemaking authority and the term in question is one which the agency "must necessarily interpret . . . in order to carry out its duties . . . ." *See Renda,* 784 N.W.2d at 12 (citing, *inter alia, City of Coralville,* 750 N.W.2d at 527).

Those circumstances exist here as well.  The Board has rulemaking authority, *see* Iowa Code section 476.2(1), and it must determine what a public utility is in order to carry out its duties.  Hence, we have an additional *Renda* ground favoring deference to the agency.

Furthermore, in a number of instances in recent years, we have deferred to Board interpretations of terms within the Board's bailiwick. *See Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762–63 (Iowa 2011) (stating that the Board's interpretation of a provision in chapter 476 should only be reversed if it is "irrational, illogical, or wholly unjustifiable"); *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643–44 (Iowa 2008) (same); *AT&T Commc'ns of the Midwest, Inc. v. Iowa Utils. Bd.*, 687 N.W.2d 554, 561 (Iowa 2004) (same). *Evercom*, it should be noted, was decided after *Renda*, but we nonetheless deferred to the Board's interpretation of a " 'substantive term within the special expertise of the agency.' "  *Evercom*, 805 N.W.2d at 762–63 (quoting *Renda*, 784 N.W.2d at 14).

For all these reasons, I believe the Board has been vested with authority to interpret the term "public utility" as applied to an alternative supplier of electrical energy under section 476.1.

True, in *NextEra Energy Resources LLC v. Iowa Utilities Board*, this court declined to defer to the Board's interpretation of the term "electric supply needs" as used in section 476.53(4)(*c*)(2).  815 N.W.2d 30, 38 (Iowa 2012).  We indicated broadly that "the general assembly did not delegate to the Board interpretive power with the binding force of law." *Id.*  Relying on this language, Eagle Point argued here that "this Court has recently held that the Board is generally not entitled to deference in interpreting *any* of the provisions of Iowa Code chapter 476 because the

legislature never intended to confer this power on the Board." (Emphasis added.) Likewise, the district court below ruled:

> The [*NextEra*] court . . . concluded . . . that the "general assembly did not delegate to the Board interpretive power with the binding force of law" with regard to interpreting chapter 476. Accordingly, here the Court will examine the Board's interpretation of the relevant sections of chapter 476 for correction of errors at law and will not give deference to the Board's interpretation.

(Citation omitted.)

But the majority here has helpfully clarified that there is no broad no-deference rule for chapter 476 and that the Board will be given deference in appropriate cases. According to the majority, "We focus on the particular statutory provision at issue in a given case." I agree with this clarification of the *NextEra* decision. *See NextEra*, 815 N.W.2d at 50–52 (Mansfield, J., specially concurring).

So why does the majority decline to give deference to the Board in this case? The majority offers two reasons why expertise is not needed and why we should not defer to the Board's interpretation of "public utility," neither of which I find persuasive. First, the majority asserts the term is not complex or technical. Second, the majority asserts the term has a legislative definition.

As to the first point, I think my colleagues have missed the boat, or at least stepped aboard the wrong boat. The issue under *Renda* is not whether the term itself is technical or complex, in the sense that you would not encounter it in everyday speech or would need a college-level vocabulary to understand it. In fact, you can read all of *Renda* and not find the words "technical" or "complex." *See generally*, 784 N.W.2d 8. The issue under *Renda* is whether the term appears across a variety of

legal contexts, such as "employee" did in *Renda,* or whether it appears to have a "specialized" meaning.  *See id.* at 13–14.

Public utility is such a specialized term.  Significantly, when the term is used elsewhere in the Code, chapter 476's definition of "public utility" is frequently incorporated by reference.  *See, e.g.,* Iowa Code §§ 8D.13(17),    306.46(2),    352.6(2)(*b*),    368.1(12),    455H.304(2)(*d*), 499.30(5), 499.33(2), 714H.4(1)(*e*), 716.6B(1)(*a*); 2013 Iowa Acts ch. 66, § 4 (codified at Iowa Code Ann. § 89.14(10) (West, Westlaw through 2014 Reg. Sess.)); 2013 Iowa Acts ch. 140, § 77 (codified at Iowa Code Ann. § 716.7(1)(*b*) (West, Westlaw through 2014 Reg. Sess.)).  "Public utility" is not a legal concept that cuts across various fields of law; it is a concept embedded in the law relating to the supply and regulation of energy, communications, and water services.[10]

---

[10]Attempting to demonstrate that "public utility" is a more general concept extending into other fields of law, the majority cites three Iowa Code provisions that do not expressly incorporate chapter 476's definition.  *See* Iowa Code §§ 412.5, 422.93, 480A.2.  However, when you examine these three cited provisions, the majority's effort to separate "public utility" from the chapter 476 context proves unsuccessful.

By any plausible reading, Iowa Code section 422.93 *implicitly* incorporates chapter 476's definition of public utility.  It explains that nothing in chapter 422 "shall be construed to require the [Board] to allow or require the use of any particular method of accounting by any public utility" for rate-regulation purposes.  *See id.* § 422.93.  This is, in effect, a reference to the Board's authority under chapter 476 and a savings clause for that authority.  It is not a potential source of a different definition.

Further, Iowa Code section 480A.2 largely replicates section 476.1's preexisting language.  *Compare* Iowa Code § 476.1, *with  id.* § 480A.2(4).  This suggests that when the legislature enacted chapter 480A in 1998, *see* 1998 Iowa Acts ch. 1148, §§ 3–8, it did not intend to establish an independent definition.

Lastly, Iowa Code section 412.5 simply clarifies that chapter 412, which deals with municipal utility retirement systems, is limited to public utilities "managed, operated, and owned by a municipality."  *See* Iowa Code § 412.5.  Rather than demonstrating that public utility has other accepted meanings outside the chapter 476 context, section 412.5 indicates the legislature believed the normal chapter 476 definition needed to be qualified.

Let's look at the standard the majority applies for determining whether Eagle Point is a public utility. The majority pulls eight factors from *Iowa State Commerce Commission v. Northern Natural Gas Co.*, 161 N.W.2d 111, 115 (Iowa 1968), a case we decided before the Iowa Administrative Procedures Act was adopted, *see* 1974 Iowa Acts ch. 1090. After reviewing the factors and making the statements I quoted at the beginning of this dissent, the majority renders what it calls a "practical judgment." The majority's practical judgment is that Eagle Point is not a public utility.

If we are talking about practical judgments, shouldn't we defer to the Board? Reading part IV(C) of the majority opinion merely reinforces in my mind that we are trying to act as experts ourselves.

Furthermore, in *Northern Natural Gas*, we emphasized that the eight factors in the test really boil down to one:

> The real question is: What does the statutory phrase "to the public" mean? We conclude it means sales to sufficient of the public to clothe the operation with a public interest and does not mean willingness to sell to each and every one of the public without discrimination.

161 N.W.2d at 115.[11] Is the entity selling enough energy (gas or electricity) to "clothe the operation with a public interest"? This seems to

---

[11]The majority says, "In order to determine whether the sales were clothed with the public interest, we utilized the eight factor . . . test." I disagree and would encourage the reader to look at *Northern Natural Gas*, 161 N.W.2d at 115. We actually recited the eight factors but then turned to the "clothed with a public interest" standard. *Id.*

Notably, in the subsequent case of *Northern Natural Gas Co. v. Iowa Utilities Board*, we relied primarily on the "clothed with a public interest" standard, not the eight-factor test. *See* 679 N.W.2d 629, 633 (Iowa 2004). We said, "We have generally interpreted [section 476.1] to mean that the Utilities Board has jurisdiction to regulate a business entity that furnishes gas by piped distribution to the public in such a manner that the public interest is affected." *Id.* Although we mentioned the "variety of factors" from the previous *Northern Natural Gas* case, we did not apply those factors but instead followed a "practical approach" that jurisdiction of the commission should be extended

me the paradigm of something that should be decided by the regulatory agency that sees such matters every day and is in a better position to assess "the public interest."

Another assertion in the majority opinion with which I disagree is the following:

> We begin with observing that we believe the standard for determining whether a gas or electric provider is a public utility under the statute must be the same. The definition of public utility in Iowa Code section 476.1 from its inception in 1963 applied both to gas and electric providers. We see no basis in the statute for applying one test for gas suppliers and another for providers of electricity.

(Citations omitted.) Why *cannot* the standard be different for gas and electricity? Contrary to the majority's claim that there is "no basis in the statute" for treating gas and electricity differently, the Board noted in its ruling two "significant" statutory differences. First, chapter 476 provides for exclusive territories for electric utilities but not gas utilities, based on a legislative determination that there should not be duplication of electric facilities. *See* Iowa Code § 476.25.[12] Second, section 476.1 contains a specific exclusion limited to certain providers of electricity. *See id.*

---

"only as necessary to address the public interest implicated." *Id.* On these grounds, we upheld the Board's assertion of its own jurisdiction. *Id.* at 634–35. Again, I question the qualifications of courts to apply a "practical approach" to regulation of electricity. We should leave this job to the experts at the Board.

[12]This section provides in part:

> It is declared to be in the public interest to encourage the development of co-ordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public. In order to effect that public interest, the board may establish service areas within which specified electric utilities shall provide electric service to customers on an exclusive basis.

Iowa Code § 476.25.

§ 476.1. Both these differences favor the treatment of small-scale competitive suppliers of electricity as public utilities.

As noted by the Board, the statutory definition of public utility excludes "a person furnishing electricity to five or fewer customers either by secondary line or from an alternate energy production facility or small hydro facility, from electricity that is produced primarily for the person's own use." *Id.* Eagle Point, it seems clear, intends to furnish electricity to *more than* five customers (the City of Dubuque is just its first), with the electricity *not produced* primarily for Eagle Point's own use. Hence, Eagle Point's operations will be on a larger scale than anything covered by the section 476.1 exclusion. That being the case, it is logical to regard Eagle Point as a public utility. When the legislature spells out what it intended to exclude, we often infer that it intended to include what remains. *See Staff Mgmt. v. Jimenez*, 839 N.W.2d 640, 649 (Iowa 2013) (noting the legislature's list of excluded persons under a workers' compensation definition did not include undocumented workers and concluding, under the doctrine of *expressio unius est exlusio alterius*, "[i]f the legislature intended the definition of a worker or employee to exclude undocumented workers, it would have done so by adding undocumented workers to the excluded list").

This gets me to the majority's second argument for not deferring to the Board. The majority points out that there is already a statutory definition of public utility in section 476.1. *See* Iowa Code § 476.1. And when the legislature defines a term, we have often found this presents an "insurmountable obstacle" to a determination that the agency has been vested with interpretive authority over that same term. *See Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 145 (Iowa 2013).

But here the statutory definition is largely circular. "Public utility" includes any entity owning or operating facilities for furnishing electricity to the "public" for compensation. *See* Iowa Code § 476.1(1). It is not disputed that Eagle Point owns facilities for furnishing electricity for compensation. The question is whether its activities are on a large enough scale to be considered serving the "public." In resolving this question, the section 476.1(1) definition offers little help.

Indeed, the majority implicitly concedes this point by relying not on the statutory definition of public utility but rather on a "practical approach" that features the majority's sundry observations on economics and energy. Contrary to the majority, I do not believe we can use the existence of a statutory definition as a reason not to defer to an agency interpretation unless we are prepared to *apply* that statutory definition.

*Hawkeye Land Co. v. Iowa Utilities Board* is a different case from the present and illustrates my point. There the issue was whether a transmission company that supplied electricity only to electrical utilities was a "public utility" itself. *See* 847 N.W.2d 199, 201 (Iowa 2014). We decided that under the "plain language" of the statute, a company that provided power only to utilities was not serving the public. *Id.* at 215–16. We also declined to defer to the Board's interpretations of section 476.27 (the crossing statute) because (1) the legislature had provided relevant definitions, (2) the statute operated in an area (eminent domain) that was subject to constitutional requirements, and (3) the Board shared decisionmaking authority under the statute with the Iowa Department of Transportation. *Id.* at 208–09. None of those circumstances applies here. There is no shared authority between the Board and anyone else, the Board's actions do not have constitutional implications, and we are not relying on a legislative definition or deciding a plain language

question.  Rather, we are substituting our own practical judgment for the Board's.

Thus, I would not second-guess the Board's determination that Eagle Point's sales of electricity are clothed with a public interest because of their potential to take sales away unpredictably from Interstate Power, which is required to make long-term investments so it can serve all customers at all times and is entitled to recoup those costs plus a reasonable rate of return from its customers.  Instead, I would reverse the district court and affirm the Board's declaratory ruling in this matter.

Waterman, J., joins this dissent.